**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| RITA CHISHOLM, | : | |
| | : | |
| Plaintiff, | : | Case No. 06-2174 (RBW) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DISTRICT OF COLUMBIA, | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The defendant District of Columbia ("The District"), through undersigned counsel and pursuant to Fed. R. Civ. P. 56(b), respectfully moves this Court for an Order granting summary judgment in its favor.   As grounds for this Motion, the defendant states as follows:

1. The plaintiff cannot demonstrate a prima facie case of age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. 621, et seq.

2. The plaintiff is not disabled under the standards of the Americans with Disabilities Act ("ADA"), 42 U.S.C. section 1211, et seq., and/or the Rehabilitation Act, 29 U.S.C. section 794, et seq.

3. The plaintiff cannot prove an actionable ADA and/or Rehabilitation Act reasonable accommodation claim.

4. The plaintiff cannot prove that she was terminated due to her alleged disability in violation of the ADA and/or the Rehabilitation Act.

A Memorandum of Points and Authorities, Statement of Undisputed Material Facts and proposed Order are attached hereto and incorporated herein by this reference.

Because this is a dispositive motion, the District is not required to seek the consent of the plaintiff before filing.

WHEREFORE, the defendant moves this Honorable Court for summary judgment in its favor.

Respectfully Submitted,

PETER J. NICKLES
Interim Attorney General for the
District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

_____/s/Nicole Lynch_____
NICOLE L. LYNCH [471953]
Section Chief
General Litigation § II

_____/s/ Alex Karpinski_____
ALEX KARPINSKI [1]
(Michigan Bar No. P58770)
Assistant Attorney General
441 4th Street, N.W., 6th Floor South
Washington, D.C.  20001
alex.karpinski@dc.gov

---

[1] Pursuant to the Local Rules of the United States District Court for the District of Columbia, Mr. Karpinski has registered with the Clerk's office as a Government Attorney and is appearing pursuant to LCvR 83.2.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| | : | |
| RITA CHISHOLM, | : | |
| | : | |
| Plaintiff, | : | Case No. 06-2174 (RBW) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DISTRICT OF COLUMBIA, | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

In August 2005, the plaintiff, an employee with the D.C. Superior Court system, was terminated from her employment for threatening to kill a co-worker. (See Exhibit C - Recommendation For Termination Memorandum & Termination Memorandum)  This threat led to the plaintiff's arrest, entry of a restraining order and plaintiff's admission of criminal responsibility in a criminal diversion program.  (See Exhibits F, G & H – Arrest Report, Restraining Order & Admission of Criminal Responsibility)

On December 21, 2006, the plaintiff filed this lawsuit, alleging that this termination violated the ADEA, ADA and/or the Rehabilitation Act.[2]  The defendant brings this motion for summary judgment as there exists no genuine issue of material fact concerning whether or not the reason for the plaintiff's termination was discriminatory

_____

[2] Plaintiff moved this Court for leave to amend her complaint to add a clam for wrongful termination.  This motion was granted by an order entered on February 12, 2008.  The Court additionally ordered that the plaintiff shall file the amended complaint on or before February 19, 2008.  To date, no such amended complaint has been filed and, as such, plaintiff's wrongful termination claim is not before the Court.

and also arguing both that the plaintiff does not suffer an actionable disability and, even if she did, her alleged disability was reasonably accommodated.

## II. STATEMENT OF FACTS

In 1985, plaintiff began working at the District of Columbia Courts as a mail clerk.  (See Exhibit A  – Plaintiff's Deposition, p. 16)  During November 2004, due to alleged tendonitis and resultant pain in her right wrist, the defendant provided the plaintiff with 5 minute breaks for every 15 minutes the plaintiff worked. (See Exhibit D – Office Memorandum of November 5, 2004)   In addition, the plaintiff requested advance leave due to the alleged tendonitis.  (See Exhibit A – Plaintiff's Deposition Testimony, p. 129)  At that time, following 19 years with the Courts, the plaintiff had less than a week of combined sick and annual leave available.  (See Exhibit A – Plaintiff's Deposition Testimony, p. 129)  Her request for advance leave was denied.  (See Exhibit A – Plaintiff's Deposition Testimony, p. 135)  Later during November 2004, the plaintiff allegedly injured her right ankle following a fall.  (See Exhibit A – Plaintiff's Deposition Testimony, pp. 67-68)  She applied for and was granted worker's compensation and left work with the Courts on November 9, 2004.  (See Exhibit A – Plaintiff's Deposition Testimony, pp. 67-68)

During the plaintiff's time working at the courts, she befriended co-worker Jennifer Galloway.  (See Exhibit A – Plaintiff's Deposition Testimony, pp. 198-202) Plaintiff encouraged Ms. Galloway to befriend her daughter, who is learning and Emotionally disabled and with whom the plaintiff wanted help.  (See Exhibit A – Plaintiff's Deposition Testimony, pp. 198-202)  Later, the plaintiff believed Ms. Galloway to be a negative influence on her daughter, began to discourage the relationship

and, during phone conversations on March 29, 2005 and April 3, 2005, had arguments with Ms. Galloway. (See Exhibit A – Plaintiff's Deposition Testimony, pp. 207-210) During the phone conversation of April 3, 2005, the plaintiff called Ms. Galloway a "fuckin' bitch." (See Exhibit A – Plaintiff's Deposition Testimony, pp. 141-143) Ms. Galloway pressed criminal charges, alleging that the plaintiff threatened to kill her during this phone conversation. (See Exhibit E – Police Report & Affidavit In Support of Arrest Warrant) On April 26, 2005, the plaintiff was arrested for threats to do bodily harm. (See Exhibit F – Arrest Report) A restraining order was entered ordering the plaintiff to stay away from Ms. Galloway. (See Exhibit G – Restraining Order) The plaintiff ultimately agreed to a diversion program in lieu of a criminal trial and admitted criminal responsibility. (See Exhibit H – Plaintiff's Admission of Criminal Responsibility) On July 25, 2005, the Courts terminated the plaintiff as a result of these threats and the resulting restraining order, effective August 5, 2005. (See Exhibit C – Recommendation For Termination Memorandum & Termination Memorandum)

Since her termination, the plaintiff has been working continuously since July 2006. (See Exhibit A – Plaintiff's Deposition Testimony, pp. 169-172) The plaintiff did not work between her termination in August 2005 and July 2006 due to an alleged inability to find work and taking time to care for her sick aunt. (See Exhibit A – Plaintiff's Deposition Testimony, pp. 169-172)

Following plaintiff's termination, Jennifer Galloway was arrested in November 2005 when illegal narcotics were found in her home. (See Exhibit B – Testimony of Dana Friend – pp. 61-65 & Exhibit I – Criminal Court Records) These charges were ultimately dismissed against Ms. Galloway after the narcotics at issue were not found to

have belonged to Ms. Galloway.  (See Exhibit B – Testimony of Dana Friend, pp. 61-65 & Exhibit I – Criminal Court Records)

On December 21, 2006, the plaintiff filed this lawsuit, alleging that her termination violated the ADEA, ADA and/or the Rehabilitation Act, on December 21, 2006. The defendant brings this motion for summary judgment as there exists no genuine issue of material fact concerning whether or not the reason for the plaintiff's termination was discriminatory and also arguing both that the plaintiff does not suffer an actionable disability and, even if she did, her alleged disability was reasonably accommodated.

Defendant respectfully requests that the Court grant its Motion for Summary Judgment for the reasons outlined below.

### III.  ARGUMENT

Summary judgment must be granted if the moving party demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Although the party moving for summary judgment has the burden of demonstrating the absence of any material facts and the right to judgment as a matter of law, the movant is not obligated to present supporting evidence. *Furguson v. District of Columbia*, 629 A.2d 15, 19 (D.C. 1993).  Instead, the moving party need only assert that there is a lack of necessary evidence to support plaintiff's case.  At that point, the burden shifts to the non-moving party to show the existence of a genuine issue of material fact. *Id.; Beard v. Area Transit Authority,* 631 A.2d 387, 390 (D.C. 1993).  Theoretical speculations, unsupported assumptions, and conclusory allegations do not rise to the level of a genuine issue of fact. *Id*.

### A.     PLAINTIFF CANNOT PROVE A CASE UNDER THE ADEA.

Plaintiff's complaint alleges that the plaintiff's termination violated the ADEA. To establish a prima facie case of age discrimination under the ADEA, a plaintiff "must demonstrate facts sufficient to create a reasonable inference that age discrimination was 'a determining factor' in the employment decision." *Hayman v. Nati'l Academy of Sciences*, 306 U.S. App. Dc 227, 23 F.3d 535 (D.C. Cir. 1994); *Cuddy v. Carmern*, 224 U.S. App. D.C. 287, 694 F.3d 843, 856-57 (D.C. Cir. 1982).  In analyzing a discrimination claim under the ADEA, the framework developed in the context of Title VII litigation is applied, *see Paquin v. Federal Nat'l Mortgage Ass'n*, 326 U.S. App. D.C. 224, 119 F.3d 23, 26 (D.C. Cir.1997)--that is, where direct evidence of discriminatory intent is not available, a party may establish unlawful age discrimination by relying on the familiar burden-shifting scheme first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).

Under the *McDonnell Douglas* framework, the employee must first establish a prima facie case of prohibited discrimination. *See Aka v. Washington Hosp. Ctr.,* 332 U.S. App. D.C. 256, 156 F.3d 1284 at 1288. In the ADEA context, the instant plaintiff must prove that (1) she belongs in the statutorily protected age group, (2) she was qualified for the position, (3) she was terminated, and (4) she was disadvantaged in favor of a younger person. *See Paquin*, 119 F.3d at 26.  If the employee succeeds in establishing a prima facie case, the burden "shifts to the employer to articulate legitimate, nondiscriminatory reasons for the challenged employment decision." *Aka*, 156 F.3d at 1288. The employer must " 'clearly set forth, through the introduction of

7

admissible evidence,' reasons for its actions which would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)) If the employer does so, the presumption of discrimination raised by the prima facie showing is rebutted and "drops from the case." *Burdine*, 450 U.S. at 255 & n.10. At that point, the employee "has an opportunity to discredit the employer's explanation," *Aka*, 156 F.3d at 1288, by demonstrating that the proffered reasons are a mere pretext for discrimination, *see Paquin*, 119 F.3d at 26-27. The employee retains throughout the "ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256.

### (1)  The Plaintiff Cannot Prove A Prima Facie Case Under The ADEA Because She Was Not Disadvantaged In Favor of a Younger Person.

Here, the plaintiff cannot prove a prima facie case of prohibited discrimination as there exists no evidence of the last prong that the plaintiff was disadvantaged in favor of a younger person. Hence, the plaintiff cannot produce the evidence necessary to satisfy the fourth prong of the applicable four part test for establishing a prima facie case of age discrimination.

Plaintiff's complaint alleges that she was treated in a discriminatory manner when younger employees[3] in her division who allegedly engaged in "activity similar" to plaintiff did not suffer the same adverse personnel actions. While plaintiff's complaint does not specifically allege what this "similar activity" was, the complaint does allege

---

[3] Plaintiff was fifty-seven (57) years old at the time of her termination.

that, subsequent to the plaintiff's removal, "at least one other Court employee" was also arrested on criminal charges and not terminated.

Contrary to plaintiff's allegations in the complaint, plaintiff has not produced evidence of any other Court employees engaging in activity similar to the threats the plaintiff made against a co-worker. In fact, there is no evidence of more than one other Court employee being arrested on criminal charges subsequent to the plaintiff's arrest. As such, the only younger employee to which plaintiff could be referring is Jennifer Galloway, who was arrested in November 2005 when illegal narcotics were found in her home. (See Exhibit B – Testimony of Dana Friend – pp. 61-65 & Exhibit I – Criminal Court Records) However, these charges were ultimately dismissed against Ms. Galloway after the narcotics at issue were not found to have belonged to Ms. Galloway. (See Exhibit B – Testimony of Dana Friend, pp. 61-65 & Exhibit I – Criminal Court Records) Given the very dissimilar nature of the charges brought against the plaintiff and the charges brought against Ms. Galloway, plaintiff cannot demonstrate a genuine issue of material fact with respect to whether or not the activities for which she and Ms. Galloway were arrested are "similar," or whether or not they can be considered "similarly situated employees" as a matter of law.

In evaluating whether the plaintiff and Ms. Galloway were similarly situated, the nature of the offenses committed and the punishments imposed are the most significant variables in a case alleging discrimination in connection with disciplinary actions. *Santa Cruz v. Snow*, 402 F. Supp. 2d 113, 125-26 (D.D.C. 2005)[4] For the plaintiff to prove that she and Ms. Galloway were "similarly situated," the plaintiff must demonstrate that she

---

[4] See also *Holloman v. Chertoff*, 2008 U.S. Dist. LEXIS 9574, (Attached as Exhibit J), analyzing "similarly situated" employees in the context of criminal charges leading to a plaintiff's termination and a subsequent discrimination suit.

and Ms. Galloway were charged with offenses of "comparable seriousness."  See *Lynn v. Deaconess Med. Ctr.*, 160 F.3d 484, 488 (8th Cir. 1998) The plaintiff must also demonstrate that all of the relevant aspects of her employment situation were nearly identical to those of Ms. Galloway.  See *Neuren v. Adduci, Mastriani, Meeks & Schill*, 310 U.S. App. D.C. 82, 43 F.3d 1507, 1514 (D.C. Cir. 1995)[5]

    Here, the nature of the offenses allegedly committed by the plaintiff and Ms. Galloway are drastically dissimilar.  First, Ms. Galloway's alleged offense in no way involved her work with the Court or any co-workers.  The plaintiff's threats against Ms. Galloway very much involved her work as a restraining order was actually entered against the plaintiff, mandating that she stay away from Ms. Galloway, her co-worker in the Courts' Budget and Finance Division.  Further, Ms. Galloway's alleged offense was in no way violent in nature.

    Additionally, the punishments imposed against Ms. Chisholm and Ms. Galloway are totally dissimilar as well.  The plaintiff admitted criminal responsibility and had a restraining order entered against her, mandating that she stay away from Ms. Galloway. (See Exhibit G – Restraining Order & Exhibit H - Plaintiff's Admission of Criminal Responsibility)  Both Ms. Galloway and plaintiff worked in the Budget and Finance Division of the Court and plaintiff worked within a short distance of Ms. Galloway. (See Exhibit C – Recommendation For Termination Memorandum & Termination memorandum)  No alternative arrangement was available.  (See Exhibit C – Recommendation For Termination Memorandum & Termination memorandum)  As such, the restraining order made the physical working situation impossible for plaintiff

---

[5] *Neuren* concluded that a female associate at a law firm who was terminated because of her failure to get along with others was not similarly situated to a less senior male associate who had trouble with legal writing.

to continue working in the division.  Further, Ms. Galloway's criminal charge was dismissed without any admission or punishment at all.  (See Exhibit B – Testimony of Dana Friend, pp. 61-65 & Exhibit I – Criminal Court Records)  Plaintiff entered a diversion program and admitted "criminal responsibility" in the case.  (See Exhibit H – Plaintiff's Admission of Criminal Responsibility)

There is no genuine issue of disputed material fact concerning whether or not the plaintiff and Ms. Galloway engaged in the same offense and were treated differently. The offenses for which they each were arrested are totally dissimilar from one another.

### (2) THE DEFENDANT'S LEGITIMATE , NON-DISCRIMINATORY REASON FOR PLAINTIFF'S TERMINATION IS NOT PRE-TEXT

Even if the plaintiff could establish that she was "disadvantaged in favor of a younger person," and thereby demonstrate at least a prima facie case under the ADEA, she cannot show that the District's legitimate, non-discriminatory reason for her termination was a pretext for age discrimination.  Once the plaintiff has demonstrated a *prima facie* case of discrimination, the defendant is afforded the opportunity to articulate a legitimate, non-discriminatory reason for its conduct.  *Price Waterhouse*, 490 U.S. at 239-41; *McDonnell-Douglas*, 411 U.S. at 802; *Milliner*, 932 F. Supp. at 351.  If the defendant satisfies this "burden of production," the burden rests with the plaintiff to prove that the employer's reason was merely a pretext, and that the true reason for the conduct was  discrimination.  *Id.*

To prove pretext, the plaintiff must meet two critical elements.  The D.C. Circuit has held that "simply casting doubt on the employer's proffered justification did not automatically enable the plaintiff to survive summary judgment."  *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290-91 (D.C. Cir. 1998) (en banc).  Rather, according to the

Supreme Court, the plaintiff must prove that: (1) the articulated justification is pretextual, *and* (2) the real reason for the action was unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."); *Stewart v. Ashcroft*, 211 F. Supp. 2d 166, 171 (D.D.C. 2002).

Here, there is simply no evidence demonstrating any genuine issue of material fact concerning whether or not the plaintiff was terminated for any discriminatory purpose or related to her age in any way. The record is clear that the plaintiff was terminated for the threats made against a co-worker and the subsequent criminal proceedings against her, including the entry of a restraining order against her, requiring her to stay away from Ms. Galloway. (See Exhibit C – Recommendation For Termination Memorandum & Termination Memorandum) The plaintiff cannot demonstrate that her termination was in any way a pretext for age discrimination. There exists no evidence that her age was ever considered. There is no evidence with which the plaintiff can demonstrate any material issue of fact as court records demonstrate that the plaintiff was arrested for threatening Ms. Galloway, a restraining order was entered and she admitted criminal responsibility through the diversion program. Summary judgment of plaintiff's ADEA claim is appropriate.

**B.    PLAINTIFF CANNOT PROVE A CASE UNDER THE ADA AND/OR THE REHABILITATION ACT.**

To make out a prima facie case under either the ADA or Rehabilitation Act, the plaintiff must show that (1) she is disabled under the Act; (2) she is "otherwise qualified" to perform her work, i.e., she can meet the essential requirements of her work, with or without reasonable accommodation; (3) she was terminated solely because of her

disability; and (4) the defendant receives federal financial assistance (for the

Rehabilitation Act claim), or is a public entity (for the ADA claim). *See Dempsey v.*

*Ladd*, 840 F.2d 638, 640 (9th Cir. 1988); *Willis v. Pacific Maritime Assoc.*, 162 F.3d

561, 565 (9th Cir. 1998)[6]

There is no evidence with which the plaintiff can establish a genuine issue of

material fact with respect to whether or not she is disabled under the meaning of the

ADA and/or the Rehabilitation Act, whether or not the defendant provided her with a

reasonable accommodation for her alleged disability or that she was terminated due to

her alleged disability.

**(1)  Plaintiff Is Not Disabled Under The Meaning of The ADA and/or The Rehabilitation Act.**

To succeed on a claim under the ADA, a plaintiff first must prove that she was

disabled within the meaning of the ADA. The Supreme Court has held that, to establish a

disability under the ADA, a plaintiff must show that she has an impairment that

substantially limits a major life activity.  *Toyota Motor Manufacturing v. Williams*, 534

U.S. 184, 195 (2002).  According to the Court:

> "substantially limited" means "unable to perform a major life activity that
> the average person in the general population can perform"; or
> "significantly restricted as to the condition, manner or duration under
> which an individual can perform a major life activity as compared to the
> condition, manner, or duration under which the average person in the
> general population can perform the same life activity."

---

[6] There is no significant difference in analysis of the rights and obligations created by the ADA and the
Rehabilitation Act.  See 42 U.S.C. section 12133 ("The remedies, procedures, and rights set forth in [the
Rehabilitation Act] shall be the remedies, procedures, and rights [applicable to ADA claims]."); *Bragdon v.
Abbott*, 524 U.S. 624, 118 S. Ct. 2196, 2202, 141 L. Ed. 2d 540 (1998) (stating that courts are required to
"construe the ADA to grant at least as much protection as provided by the regulations implementing the
Rehabilitation Act").  Thus, courts have applied the same analysis to claims brought under both statutes,
see *Doe v. Univ. of Maryland Med. Sys. Corp.*, 50 F.3d 1261, 1265 n.9 (4th Cir. 1995) ("Because the
language of the two statutes is substantially the same, we apply the same analysis to both.")

*Id.* at 195-96 (quoting EEOC Regulations, 29 C.F.R. s 1630.2(j) (2001)).  The Court

further noted that "these terms need to be interpreted strictly to create a demanding

standard for qualifying as disabled."  *Id.* at 196 (citing 42 U.S.C. § 12101(a)(1)).

Moreover, it is not sufficient for the plaintiff to provide evidence that his or her

disability is capable of causing such limitations.  Instead, "a plaintiff must prove a

substantial limit with specific evidence that *his particular* impairment substantially limits

*his particular* major life activity."  *Waldrip v. General Electric Co.*, 325 F.3d 652, 656

(5th Cir. 2003) (emphasis in original).  The Fifth Circuit Court of Appeals explained:

> The ADA requires those 'claiming the Act's protection to prove a
> disability by offering evidence that the extent of the limitation caused by
> their impairment in terms of their own experience is substantial.'" *Toyota*,
> 534 U.S. at 198 (quoting *Albertson's*, 527 U.S. at 567) (alterations
> omitted). A plaintiff cannot survive summary judgment by showing that
> an impairment like his own could substantially limit a major life activity
> of another person or in his own future. Rather, he must show that his
> impairment has actually and substantially limited the major life activity on
> which he relies.

*Id.*

When determining whether a plaintiff has shown a "substantial" limitation of a

major life activity—such as walking, standing, bending, or lifting—"the central inquiry

must be whether the claimant is unable to perform the variety of tasks central to most

people's daily lives."  *Toyota Motor*, 534 U.S. at 200-01.  According to the Supreme

Court, courts making such a determination should focus on whether a plaintiff can

perform household chores and personal hygiene, because these are "the types of manual

tasks of central importance to people's daily lives."  *Id.* at 201.

In *Black v. Roadway Express, Inc.*, the plaintiff alleged that, due to several knee

surgeries, he was substantially limited in the major life activities of "walking, kneeling,

stooping, jogging, lifting, sitting in confined, restricted positions, running, [and] climbing." 297 F.2d 445, 451 (6th Cir. 2002). In support of this allegation, the plaintiff attested that he could not kneel or stoop, could not sit for any extended period of time where movement was restricted, was able to walk—with a constant limp—only short distances, could not stand for long period, could not exercise a full range of motion with his leg, and could not run or jog at all. *Id.* at 450-51. The Sixth Circuit Court of Appeals affirmed summary judgment for the defendants, holding that the plaintiff's "alleged inability to perform certain tasks or functions on a repeated or prolonged basis is not enough, as a matter of law, for him to meet the threshold requirement of proving that he is 'disabled.'" *Id.* at 450. The Sixth Circuit explained that "[m]oderate difficulty or pain experienced while walking does not rise to the level of a disability." *Id* at 451. The court primarily based its decision on the fact that the plaintiff could perform many tasks central to daily life. In his deposition, the plaintiff had testified that, on an average day, he could clean his house, do the chores around the house, and "get a little exercise." *Id.* The court concluded that "no reasonable jury could find the plaintiff disabled in any major life activity other than working." *Id.*

Similarly, in *Marinelli v. City of Erie*, the plaintiff alleged that his back injury substantially limited his ability to engage in a major life activity, because he was "unable to perform household chores, such as cleaning his floors," and he was "unable to lift objects on greater than a sedentary scale." 216 F.2d 354, 362 (3rd Cir. 2000). The Third Circuit held that these allegations, even if true, could not satisfy the rigid standards for an ADA disability, writing:

> courts have generally held that "cleaning," or, more generally, "doing housework," does not qualify as a major life activity. Although the EEOC

> regulations list "caring for oneself" as a major life activity, courts interpreting this regulation have held that such relates only to basic activities such as washing dishes and picking up trash. … In other words, "cleaning" is only considered a major life activity to the extent that such an activity is necessary for one to live in a healthy or sanitary environment. On the other hand, merely "performing housework other than basic chores" does not qualify as a major life activity.

*Id.* (internal citations omitted); *see also Toyota Motor*, 534 U.S. at 200-01 (holding that plaintiff had not established an ADA-protected disability as a matter of law because she "could still brush her teeth, wash her face, bathe, tend to her flower garden, fix breakfast, do laundry, and pick up around the house"); *Weber v. Strippit, Inc.*, 186 F.3d 907, 914 (8th Cir. 1999) (holding that plaintiff could not establish an ADA-protected disability based on his inability to shovel snow, garden, and mow his lawn); *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1025 (5th Cir. 1999) (holding that plaintiff could not establish ADA-protected "walking" disability based on her claim that she "walks with a limp and moves at a significantly slower pace than the average person," and that extreme cold exacerbates these conditions).

The *Marinelli* court also explained that the plaintiff's claim of a "lifting" disability—based on his inability to lift more than ten pounds—was insufficient to survive a directed verdict, explaining that "courts have rejected claims of disability based on an inability to lift similar weights to those with which those with which Marinelli alleges to experience difficulty." *Id.* at 363-64 (citing *Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346 (4th Cir. 1996) (25-pound lifting restriction not significantly limiting); *Ray v. Glidden Co.*, 85 F.3d 227, 229 (5th Cir. 1996); *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1319 (8th Cir. 1996); *Thompson v. Holy Family Hosp.*, 121 F.3d 537 (9th Cir. 1997) (per curiam)); s*ee also Siragy v. Georgetown*

*University*, C.A. 97-2557 (RMU), 1999 U.S. Dist. LEXIS 21021, *10-11 (D.D.C. 1999) (holding that seven-pound lifting restriction and ten-pound pushing/pulling restriction "simply does not comprise an interference with any major life activities as was intended under the ADA").

      Here, the plaintiff alleges "disabling injuries to her wrist and ankle" and that "at least one of these injuries" constitutes a "substantial limitation of a major life activity." However, there is no evidence that the plaintiff's ability to engage in and perform the sort of major life activities required in order to establish an actionable disability or the variety of activities central to most people's daily lives, is limited in any way.  The plaintiff testified that her disabilities were tendonitis and a temporary ankle injury.  (See Exhibit A – Plaintiff's Deposition Testimony, p. 85 & p. 162)  Further, the plaintiff testified that she has been working continuously since July 2006 and that she cared for a sick relative between August 2005 and July 2006.  (See Exhibit A – Plaintiff's Deposition Testimony, pp. 169-172)  Finally, the plaintiff also testified that she reasons she did not work between her termination in August 2005 and July 2006 were inability to find work and taking time to care for her sick aunt.  (See Exhibit A – Plaintiff's Deposition Testimony, pp. 169-172)  In sum, then, the plaintiff's alleged disabilities have certainly not limited or prevented her from performing activities central to her daily life and, in fact, have not even prevented her from working.  The plaintiff does not suffer an actionable disability and summary judgment as to her ADA/Rehabilitation Act claim is warranted.

      **(2) The Plaintiff Cannot Prove That She Was Denied Reasonable Accomodation For Her Alleged Disability.**

      The plaintiff alleges that "rather than attempting to accommodate Ms. Chisholm," the defendant terminated her in violation of the ADA and the Rehabilitation Act.  (See

Exhibit A – Plaintiff's Complaint, paragraph 48)  To establish a *prima facie* case for

failure to accommodate, a plaintiff must show:

> (1) that [she] was an individual who had a disability within the meaning of
> the statute; (2) that the employer had notice of [her] disability; (3) that
> with reasonable accommodation [she] could perform the essential
> functions of the position; and (4) that the employer refused to make such
> accommodations.

*Bugg-Barber v. Randstad US, L.P.*, 271 F. Supp. 2d 120 at 127 (2003) (quoting

*Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 (D.D.C. 2002) and *Rhoads v. FDIC*, 257

F.3d 373, 387 n.11 (4th Cir. 2001)).

An employer is not required to provide a disabled employee with the precise

accommodation the employee requests; the law requires only that an employer provide

accommodation that is "reasonable" under the circumstances.  An accommodation is

reasonable if it  will allow the employee to perform his or her job duties at a satisfactory

level.  *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1162 (10th Cir. 1999); *Gile v.*

*United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir.1996).

Here, there is no genuine issue of material fact concerning whether or not the

plaintiff was provided a reasonable accommodation for her alleged disability.  Plaintiff

testified that her alleged disability was tendonitis in her right wrist and that she produced

a doctor's note to her supervisor providing that her work should be limited and that she

would require breaks in between her duties.  (See Exhibit A – Plaintiff's Deposition

Testimony, p. 90)  This alleged disability was provided the accommodation of 5 minute

breaks for every 15 minutes the plaintiff worked on her computer.  (See Exhibit D –

Office Memorandum of November 5, 2004)  In a typical 8 hour workday, this would total

over two and half hours of break time for the plaintiff.  Given that the plaintiff's alleged

disability was accommodated, and in the very way plaintiff testified her physician requested, there can be no argument that the plaintiff was not reasonably accommodated.

Further, to the extent the plaintiff's complaint also references an ankle injury, it was plaintiff's testimony that she went home the day she injured her ankle, and never returned to work.  (See Exhibit A – Plaintiff's Deposition Testimony, p. 95)  Given that plaintiff never actually worked for the defendant while suffering from any alleged injury to her ankle, it is not part of any claim for failure to reasonably accommodate an alleged disability, nor can she claim that the defendant was given an opportunity to provide an accommodation.

> **(3)  There Exists No Evidence That The Plaintiff Was Terminated Due To Her Alleged Disability.**

Discrimination claims under the ADA follow the familiar burden-shifting approach first adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Raytheon Co. v. Hernandez*, 124 S. Ct. 513, 518, 540 U.S. 44 (2003).  To state a *prima facie* case of discrimination, a plaintiff must show that: (1) she had a disability within the meaning of the ADA, (2) she was "qualified" for the position with or without a reasonable accommodation, and (3) that she suffered an adverse employment action because of her disability.  *Swanks v. Washington Metropolitan Area Transit Authority*, 179 F.3d 929, 934 (D.C. Cir. 1999) (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999); *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997); *White v. York Int'l Corp.*, 45 F.3d 357, 360-61 (10th Cir. 1995)).

The plaintiff in this action cannot meet her *prima facie* burden.  As demonstrated above, she has not alleged a disability "within the meaning of the ADA."  *Swanks*, 179

F.3d at 934.  Furthermore, even if the plaintiff could state a *prima facie* claim, the District has articulated a legitimate, nondiscriminatory reason for terminating her employment. (See argument in section A)

Again, the plaintiff was terminated due to her threatening a co-worker which led to her arrest and entry of a restraining order.  (See Exhibit C – Recommendation For Termination Memorandum & Termination Memorandum) The plaintiff admitted criminal responsibility for these threats.  (See Exhibit H – Plaintiff's Admission of Criminal Responsibility) There is no evidence to suggest that the District's articulated reasons for terminating the plaintiff were pretextual or otherwise intended to disguise disability discrimination.  As such, even if the plaintiff could satisfy her *prima facie* burden of production, she cannot refute the District's legitimate, non-discriminatory reason for terminating her employment.  The District therefore is entitled to judgment as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, defendants move this Court for summary judgment in their favor.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General
District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

    /s/ Nicole Lynch
NICOLE LYNCH [471953]
Section Chief
General Litigation Section II

20

_____/s/ Alex Karpinski_____
ALEX KARPINSKI [7]
(Michigan Bar No. P58770)
Assistant Attorney General
441 4th Street, N.W., 6th Floor South
Washington, D.C.  20001
alex.karpinski@dc.gov

---

[7] Pursuant to the Local Rules of the United States District Court for the District of Columbia, Mr. Karpinski has registered with the Clerk's office as a Government Attorney and is appearing pursuant to LCvR 83.2.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| | : | |
| RITA CHISHOLM, | : | |
| | : | |
| Plaintiff, | : | Case No. 06-2174 (RBW) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DISTRICT OF COLUMBIA, | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

**DEFENDANT DISTRICT OF COLUMBIA'S STATEMENT
OF UNDISPUTED MATERIAL FACTS**

1.      In 1985, plaintiff began working at the District of Columbia Courts as a mail clerk.  (See Exhibit A – Plaintiff's Deposition, p. 16)

2.  During November 2004, due to alleged tendonitis and resultant pain in her right wrist, the defendant provided the plaintiff with 5 minute breaks for every 15 minutes the plaintiff worked. (See Exhibit D – Office Memorandum of November 5, 2004)

3.  In addition, the plaintiff requested advance leave due to the alleged tendonitis. (See Exhibit A – Plaintiff's Deposition Testimony, p. 129)

4.  At that time, following 19 years with the Courts, the plaintiff had less than a week of combined sick and annual leave available.  (See Exhibit A – Plaintiff's Deposition Testimony, p. 129)

5.  Her request for advance leave was denied.  (See Exhibit A – Plaintiff's Deposition Testimony, p. 135)

22

6.  Later during November 2004, the plaintiff allegedly injured her right ankle following a fall.  (See Exhibit A – Plaintiff's Deposition Testimony, pp. 67-68)

7.  She applied for and was granted worker's compensation and left work with the Courts on November 9, 2004.  (See Exhibit A – Plaintiff's Deposition Testimony, pp. 67-68)

8.  During the plaintiff's time working at the courts, she befriended co-worker Jennifer Galloway.  (See Exhibit A – Plaintiff's Deposition Testimony, pp. 198-202)

9.  Plaintiff encouraged Ms. Galloway to befriend her daughter, who is learning and emotionally disabled and with whom the plaintiff wanted help.  (See Exhibit A – Plaintiff's Deposition Testimony, pp. 198-202)

10.  Later, the plaintiff believed Ms. Galloway to be a negative influence on her daughter, began to discourage the relationship and, during phone conversations on March 29, 2005 and April 3, 2005, had arguments with Ms. Galloway.  (See Exhibit A – Plaintiff's Deposition Testimony, pp. 207-210)

11.  During the phone conversation of April 3, 2005, the plaintiff called Ms. Galloway a "fuckin' bitch."  (See Exhibit A – Plaintiff's Deposition Testimony, pp. 141-143)

12.  Ms. Galloway pressed criminal charges, alleging that the plaintiff threatened to kill her during this phone conversation.  (See Exhibit E – Police Report & Affidavit In Support of Arrest Warrant)

13.  On April 26, 2005, the plaintiff was arrested for threats to do bodily harm. (See Exhibit F – Arrest Report)

14. A restraining order was entered ordering the plaintiff to stay away from Ms. Galloway. (See Exhibit G – Restraining Order)

15. The plaintiff ultimately agreed to a diversion program in lieu of a criminal trial and admitted criminal responsibility. (See Exhibit H – Plaintiff's Admission of Criminal Responsibility)

16. On July 25, 2005, the Courts terminated the plaintiff as a result of these threats and the resulting restraining order, effective August 5, 2005. (See Exhibit C – Recommendation For Termination Memorandum & Termination Memorandum)

17. Since her termination, the plaintiff has been working continuously since July 2006. (See Exhibit A – Plaintiff's Deposition Testimony, pp. 169-172)

18. The plaintiff did not work between her termination in August 2005 and July 2006 due to an alleged inability to find work and taking time to care for her sick aunt. (See Exhibit A – Plaintiff's Deposition Testimony, pp. 169-172)

19. Following plaintiff's termination, Jennifer Galloway was arrested in November 2005 when illegal narcotics were found in her home. (See Exhibit B Testimony of Dana Friend – pp. 61-65 & Exhibit I – Criminal Court Records)

20. These charges were ultimately dismissed against Ms. Galloway after the narcotics at issue were not found to have belonged to Ms. Galloway. (See Exhibit B – Testimony of Dana Friend, pp. 61-65 & Exhibit I – Criminal Court Records)

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General
District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division


___/s/ Nicole Lynch_____
NICOLE LYNCH [471953]
Section Chief
General Litigation Section II


____/s/Alex Karpinski_____
ALEX KARPINSKI [8]
(Michigan Bar No. P58770)
Assistant Attorney General
441 4th St., NW, 6th Floor South
Washington, DC 20001
(202) 724-6642
Fax No. (202) 727-3625
alex.karpinski@dc.gov

---

[8] Pursuant to the Local Rules of the United States District Court for the District of Columbia, Mr. Karpinski has registered with the Clerk's office as a Government Attorney and is appearing pursuant to LCvR 83.2.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| RITA CHISHOLM, | : | |
| | : | |
| Plaintiff, | : | Case No. 06-2174 (RBW) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DISTRICT OF COLUMBIA, | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

**ORDER**

Upon consideration of the defendant District of Columbia's Motion for Summary

Judgment, and the record herein, it is this _____ day of _____, 2008,

**ORDERED:** that said Motion be and that same hereby is GRANTED and that plaintiff's

claims against the defendant District of Columbia are dismissed with prejudice.


_____
**REGGIE B. WALTON
United States District Judge**

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of March, 2008, I caused the foregoing MOTION FOR SUMMARY JUDGMENT, STATEMENT OF UNDISPUTED MATERIAL FACTS and proposed ORDER to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

**Douglas Hartnett, Esquire**
**Elitok & Hartnett At Law, L.L.C.**
**2428 Wisconsin Avenue, N.W.**
**Washington, D.C. 20007**

___/s/Alex Karpinski_____
ALEX KARPINSKI [9]
(Michigan Bar No. P58770)
Assistant Attorney General
441 4th St., NW, 6th Floor South
Washington, DC 20001
(202) 724-6642
Fax No. (202) 727-3625
alex.karpinski@dc.gov

---

[9] Pursuant to the Local Rules of the United States District Court for the District of Columbia, Mr. Karpinski has registered with the Clerk's office as a Government Attorney and is appearing pursuant to LCvR 83.2.

EXHIBIT A

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

RITA CHISHOLM,                    )

    Plaintiff,               ) CIVIL ACTION NO.:

v.                                )    06-2174 (REW)

DISTRICT OF COLUMBIA,             )

    Defendant.               )

----------------------

    Deposition of RITA ELIZABETH CHISHOLM,

taken on Wednesday, November 14, 2007 at 1:00

p.m., at the Office of the Attorney General for

the District of Columbia, One Judiciary Square,

441 4th Street, Northwest, Suite 600 South,

Washington, D.C., before E. Marsellas Coates,

Notary Public.

--------------------

Reported by:

E. Marsellas Coates



*Precise Reporting Services*
(301) 210-5092
*Serving MD, D.C. & VA*

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

16

1    years ago, 15 years ago, 5 years ago?

2         A.  It could have been 10 years when I got

3    it.  I'm not positive when.

4         Q.  Ten years ago?

5         A.  I don't know exactly when.  So I would

6    have to look at it to tell you what year.

7         Q.  Okay.  That's fine.

8         A.  Uh-huh.

9         Q.  That's fine.  So that would be the only

10   award you received at work, correct?

11        A.  The ten year pin, and I got a plaque.

12        Q.  When did you start working at the D.C.

13   Court?

14        A.  In '85.

15        Q.  And what was your position when you

16   started?

17        A.  Mail clerk.

18        Q.  And do you remember what grade you were?

19        A.  I don't know.  I can't remember.

20        Q.  You can't remember?

21        A.  Uh-uh.

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

67

1   left the Court, so I can't remember exactly what

2   he said.  But it was a good evaluation.

3        Q.  Okay.  So the answer would be, no, you

4   can't remember any of the specifics about what

5   your supervisor said about --

6        A.  Yes, ma'am.

7        Q.  -- your evaluation?

8        During your time at the Court, did you

9   ever apply for a transfer?

10       A.  Yes.  While I was out, I didn't want to

11  go back to Criminal Finance.

12       Q.  Okay.  That was while you were out.

13  What were you out on?

14       A.  Workmen's Comp.

15       Q.  And what was that injury?

16       A.  I tore the ligaments -- I had a

17  tendonitis problem first (indicating), and I was

18  being tended by a physician.

19       Q.  You're pointing to your arm?

20       A.  Yeah.

21       Q.  You had a tendonitis problem in your

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

68

1    arm?

2        A.  Yes.

3        Q.  And you were what?

4        A.  And then while I was going back and

5    forth with paperwork to Personnel, I told -- I

6    had tendonitis in here (indicating) and I had

7    torn a ligament.  I tripped and tore the ligament

8    in my right foot.

9        Q.  In your foot?

10       A.  My ankle.

11       Q.  In your ankle?

12       A.  Uh-huh.

13       Q.  Okay.  And so you were out on Workers'

14   Comp for both of those injuries --

15       A.  Uh-huh.

16       Q.  -- or just one?  For both?

17       A.  Uh-huh.

18       Q.  How long were you out on Workers'

19   Compensation?

20       A.  I never went back.  I left on November

21   the 9th of '04 for the torn ligament.  The

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

129

1    A.  I didn't have much, that's why I asked

2    for advance leave from Cyril.

3    Q.  Did you have any sick leave available?

4    A.  I had a little bit, not much.  I don't

5    think I had a week.

6    Q.  You didn't have a week?

7    A.  I don't think so.  I might have, but I

8    can't remember.  It wasn't much.  That's why I

9    requested leave.  Because I knew -- that was

10   before I tore my ligaments in my ankle.  I had

11   asked to -- because I needed to have surgery on

12   my wrist.

13   Q.  Now, are you aware of the policies

14   regarding advance leave at the D.C. Courts?

15   A.  Uh-huh.

16   Q.  What are they?

17   A.  They have to approve it first, the

18   supervisor, and then it goes through three

19   people's hands, I believe.

20   Q.  Whose hands?

21   A.  His, his supervisor, and I think it goes

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

135

1    A.  He signed it for me to get it.  And then

2  when I called him back, after -- when I called

3  concerning my paycheck, Marguerita told me on the

4  phone, oh, by the way, he rejected your advance

5  leave.  And I asked to speak to him.

6         And he told me -- I asked him, why?  He

7  told me that he wanted people here to work, he

8  was running a business.  And I said you told me

9  that I would get it.  You approved it.  And I

10  said why did you change your mind, and he kept

11  saying the same thing over and over again.

12    Q.  Did you tell you at any time that he

13  decided not to approve it because it was not

14  going to be approved by Ms. Wicks?

15    A.  No.  He didn't tell me that.

16    Q.  He didn't tell you that?

17    A.  No.

18    Q.  Did you ask anybody else about your

19  advance leave, besides Mr. Aruggo?

20    A.  No.  I talked to him.

21    Q.  Besides him?

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

141

1    her?

2        A.  Yes.  We got into words, and I told her

3    just not to call there anymore.

4        Q.  What were the words you go into?  You

5    keep saying we go into words.  In my experience

6    we had another argument or a continuation of the

7    argument and words were spoken?

8        A.  Yeah.  I said some -- some -- some words

9    to her, profound words, and she said some to me.

10       Q.  Profound?

11       A.  Yes.

12       Q.  Or profane?

13       A.  Profanity.  Okay.  Profanity.

14       Q.  Profane words.

15           MR. HARTNETT:  Profane words.

16       A.  Uh-huh.

17       Q.  What kind of words did you say to her?

18       A.  I called her some names.

19       Q.  You old enough to say them on the phone,

20   why don't you say it now?

21       A.  I called her a bitch.

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

142

1      Q.  Uh-huh.  That's the only name you called

2  her?

3      A.  I told her fuckin' bitch.

4      Q.  Uh-huh.  And what else did you say?

5      A.  I told her to get off the phone and

6  leave me alone and I didn't want her to pick up

7  the phone calling again.  I told her don't call

8  my house anymore.

9      Q.  Uh-huh.

10     A.  And I hung up.

11     Q.  Did she --

12     A.  She -- she cursed at me, also.

13     Q.  What she said to you?

14     A.  I didn't really pay too much attention,

15  because I was trying to out talk her, and I said

16  what I had to say and I got off the phone.  But

17  she was cursing at me.

18     Q.  Who started yelling first?

19     A.  I don't know.

20         MR. HARTNETT:  I'm going to object to

21  you -- you said yelling.  There isn't any

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

143

1   testimony they were yelling.

2        Q.  I'm sorry.  Was anyone yelling?

3        A.  Yeah.

4        Q.  I thought you did say yelling?

5        A.  Yeah.

6        Q.  Okay.  So who started yelling first?

7        A.  I don't know.  But I got on the phone

8   and told her to get off the phone.  It

9   escalated -- the voices escalated on both sides.

10       Q.  Was it safe to say you were very upset

11  that she was on the phone with your daughter

12  saying this?

13       A.  Oh, yeah.

14       Q.  So your voice might have been escalated?

15       A.  And hers, too.

16       Q.  Oh, I'm not saying that hers wasn't.

17  I'm asking you about you first?

18       A.  I just told you, mine did.

19       Q.  Okay.  So was that the only phone call

20  you had with Ms. Galloway?

21       A.  That's right.

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

153

1    criminal charges; is that correct?

2        A.  I'm saying yeah.  Correct.

3        Q.  Okay.  Thank you.  What was the result

4    of those charges that Ms. Galloway filed?  What

5    happened to you?

6        A.  They locked me up.

7        Q.  For how long?

8        A.  About until that -- that day.  I went

9    and turned myself in.

10       Q.  Uh-huh.

11       A.  And I was held in a holding cell until I

12   had go be transferred to the Court.

13       Q.  Where did you turn yourself into it?

14       A.  I done forget which district it is.  I

15   went to D.C.  I leave in Virginia.

16       Q.  Uh-huh.  You don't remember where it

17   was?

18       A.  I done forget which one.  I have look at

19   the paperwork again to find out which one it was.

20           MS. JACKSON:  Do you have that

21   paperwork, Counsel?

PRECISE REPORTING SERVICES
(301) 210-5092  (877) 4 A STENO

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

154

1          MR. HARTNETT:  I don't know if I do.

2          MS. JACKSON:  Can I get a copy of it,

3    please?

4          MR. HARTNETT:  Sure.  I'll -- I'll give

5    you everything -- if I haven't already given you

6    everything I got on the criminal charges.

7          Q.  So you were held for that day or

8    whatever, and then what happened?

9          A.  I had go in front of the Judge.

10         Q.  And what happened?

11         A.  I told him I was not guilty.  And they

12    gave me some type of paper saying to stay away, a

13    Stay Away Order, from her.

14         Q.  How far away were you supposed to stay

15    away from her?

16         A.  I don't know.

17         Q.  You don't remember?

18         A.  I don't know how man -- I don't know

19    what feet or what, I don't know.  But I never

20    went near her anyway.  So it was a paper that

21    they gave me.

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

169

1      Q.  I know.  It's just a joke.

2      A.  Oh.  Oh.

3      Q.  Okay.  So can you provide your Counsel

4  with the name of that person?

5      A.  I don't even remember who that was.  It

6  was some doctor in D.C.  I can't remember who it

7  was.  I went to him one time.

8      Q.  He'll get with you so you could do that

9  so I could get it.

10         What other injuries are you alleging are

11  a result of the discrimination?

12     A.  Well, financially --

13     Q.  Uh-huh.

14     A.  -- I'm really suffering.  I lost all of

15  my insurance, life insurance, my wages.  What I'm

16  living off of was money from my Social Security

17  -- I mean, retirement.  They only gave me half of

18  that.  And the job that I got, I was making

19  minimum wages.

20     Q.  Have you been working continuously since

21  you were terminated?

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

170

1    A.  Not continuously.  I just got this job

2  recently, and I had the job at the EPA, under

3  that other contracting company, and I did

4  temporary work.

5    Q.  When you did temporary work -- I mean,

6  have you been doing temporary work since 2004?

7    A.  I didn't do it in 2004.  I injured my

8  ankle in 2004.

9    Q.  When were you well?

10    A.  Well, I broke this wrist (indicating)

11  after I had surgery on that.

12    Q.  When were you well?

13    A.  I don't know what year that was.  It was

14  after I had surgery in the -- the following year

15  I had surgery on my wrist on Valentine's Day.

16  And I had to recuperate from that.  And then when

17  the stitches came out, I fell and broke this

18  wrist (indicating).

19    Q.  Where'd you fall?

20    A.  So that had to been -- uh?

21    Q.  Where'd you fall?

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

171

1      A.  Gas station.

2      Q.  Did you make a claim against the gas

3  station?

4      A.  No.  Uh-uh.

5      Q.  You fell and broke your wrist, do you

6  remember if that was in '05 or '06?

7      A.  I think was in '05.

8      Q.  Okay.  And how long did it take you to

9  recover from your broken wrist?

10     A.  I don't know.  I don't know.  It took a

11  while.  And I couldn't find a job right away no

12  way, so.

13     Q.  So am I -- am I safe to assume that you

14  started back --

15     A.  And --

16     Q.  -- working in -- sometime in 2005?

17     A.  No, I didn't.  My aunt was ill in

18  Richmond, and I went down there.

19     Q.  Okay.  How long were you down there?

20     A.  On and off, I was down just practically

21  the whole year -- but not the whole year, but I

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

172

1    went down there and stayed for two and a half

2    months.  She was critical.  I came back up here

3    and she died, last October.

4          Q.  October of '06?

5          A.  Yes.

6          Q.  So were you in Virginia until October of

7    '06 or -- I'm trying to figure out when you got

8    back here and started back looking for work?

9          A.  I started after I came back in July.

10          Q.  July of '06?

11          A.  Uh-huh.

12          Q.  Okay.  So from July of 2006 until today

13    you've been working temporary jobs or contract

14    jobs; is that correct?

15          A.  Uh-huh.

16          Q.  And prior to that from --

17          A.  '05.

18          Q.  -- when you were terminated in '05 to

19    July of '06 you were not working?

20          A.  No.

21          Q.  Okay.  About how much money have you

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

198

1    A.  No.  Not really.  She does things that

2  she shouldn't do sometimes; she just don't think.

3    Q.  Okay.  But not that would physically

4  harm her and be a danger to her?

5    A.  No.  She has done some things that has

6  harmed her, but I've taken care of that, I mean.

7    Q.  Now, you testified earlier that you

8  asked Ms. Galloway to befriend your daughter; is

9  that correct?

10    A.  We discussed that -- she heard me on the

11  phone talking about her.  She ran off to

12  California.

13    Q.  She who?

14    A.  My daughter.

15    Q.  Oh, she did?

16    A.  Sheenya Johnson.

17    Q.  She ran off with whom?

18    A.  No one.  She ran to California thinking

19  she was going to be a designer.

20    Q.  Designer of what?

21    A.  I don't know.  But she did, to a school.

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

199

1   And with no money or anything, she had no

2   medicine or anything.  And she wind up in the

3   psychiatric hospital.

4        Q.  How did she get to California?

5        A.  Got a ticket and went on the train.

6        Q.  So she had enough money to get a ticket,

7   just not enough money to live when she got out

8   there?

9        A.  No.  She thought she was going to live

10  at the school.

11       Q.  Okay.  So you asked Ms. Galloway to

12  befriend her?

13       A.  No, not at first.  She overheard me

14  talking to her and the staff in California.  And

15  she told me about her brother being disabled.

16  And that's how we got to talking.

17       Q.  Okay.  And what did y'all talk about?

18       A.  Well, she told me that -- well, she told

19  me about herself.  She told me she had been a bad

20  apple herself, out of the girls that her mother

21  had.  And she had run off and was pregnant and

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

200

1    she came back home.  Her mother couldn't tell her

2    anything.

3        Q.  Uh-huh.

4        A.  And then she told me about, maybe she

5    could set her straight on some things, by her

6    being her age limit -- I mean closer to her age,

7    she thought she could talk to her.  And I said

8    okay, when she came back.  And that's how we got

9    to talking.

10       Q.  You said okay, so when your daughter

11   came back you would hook her up with your

12   daughter?

13       A.  Yeah.  She started talking to her.

14       Q.  And so that's what happened?

15       A.  Yes.

16       Q.  And so, based on what I am gleaning from

17   you, it took a tragic turn and she became a

18   negative influence on your daughter; is that

19   correct?

20       A.  Yes, she did.

21       Q.  And how did she become a negative

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

201

1    influence on your daughter?

2        A.  Well, things that I would tell my

3    daughter as far as her job is concerned -- she

4    had a job working at Target and -- well, she got

5    the job afterwards when she came back -- and I

6    told her, don't tell them that she could work

7    full-time, because she gets a disability check.

8        Q.  Uh-huh.

9        A.  And Jennifer, behind my back, was

10   telling her go on and do it.  I told her it would

11   interfere -- told my daughter -- it would

12   interfere with her check.  They would cut a lot

13   of her money, considering.  And it might

14   interfere with her getting her Medicaid and

15   Medicare.

16       Q.  Okay.

17       A.  And my daughter was calling her back and

18   forth.  And then it got to a point that Jennifer

19   -- we had a partition between us, and I could

20   hear her whispering and talking to my daughter

21   behind my back, saying negative things, that I

202

1    didn't approve of.

2        Q.  Why did your daughter want to work

3    full-time?

4        A.  That's the way she is.  She feels that

5    she can do things a normal person can do.

6        Q.  So was she rebelling against you because

7    you were telling her she couldn't?

8        A.  She always have.

9        Q.  What other instances where she's

10   rebelled against you?

11       A.  Different things.  When I tell her

12   things that she shouldn't do, things that I felt

13   was wrong, she would feel that she could do it.

14       Q.  Like what?

15       A.  Going out and meeting men, when she

16   didn't know anything about them.  Things like

17   that.

18       Q.  Okay.  So she was a little

19   strong-willed?

20       A.  Yes.  And still is.

21       Q.  Okay.  So you said that she was

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

207

1      A.  Because she would tell me things.

2      Q.  Was she encouraging Jennifer to do these

3  things?

4      A.  No.

5      Q.  No?

6      A.  She didn't know why.  She asked me why

7  was she saying that.  I said I have no idea why

8  she would say that.  I had no animosity against

9  her other than I just backed off from her, and I

10 told my daughter to leave her alone.

11     Q.  Okay.

12     A.  I told her to leave her alone.

13     Q.  Now, you testified earlier that your

14 daughter called Ms. Galloway at work?

15     A.  Quite a bit.

16     Q.  So, at the time of the alleged incident

17 were you -- where Ms. Galloway alleges you

18 threatened her -- was that a time when Ms. --

19 when your daughter called her --

20     A.  No.

21     Q.  -- at work?

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

208

1      A.  Galloway called my daughter that Sunday

2   evening.

3      Q.  Uh-huh.

4      A.  Called my house.

5      Q.  Uh-huh.

6      A.  And I overheard the conversation.

7      Q.  Okay.  And were there any calls after

8   that Sunday?

9      A.  No.  I don't think so.  Unless that day

10   when she talked to her at work, I don't know when

11   that was.  But the date was -- I would have to

12   look in the papers --

13      Q.  At your notes?

14      A.  Uh-huh.  -- to see.

15      MS. JACKSON:  Can you supplement and let

16   me know what the consensus is?

17      MR. HARTNETT:  I thought that they were

18   in the - -

19      THE WITNESS:  It's in the complaint.

20      MR. HARTNETT:  There was two different

21   phone calls.

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

209

1          THE WITNESS:  It was two different phone

2    calls.

3          MR. HARTNETT:  If I'm not mission --

4          THE WITNESS:  That was in the appeal.

5          MR. HARTNETT:  -- the one at the

6    workplace was first, if I'm not mistaken, but I'm

7    not sure.

8          MS. JACKSON:  One moment, please.

9          (Brief pause in proceedings.)

10         Q.  (Counsel reviewing documents.)  See, I'm

11   looking at page 8, paragraph 30 and 31.  It says

12   on March 29th Ms. Chisholm was at home and overheard

13   -- what his her name, your daughter's name?

14         A.  Sheenya.

15         Q.  Sheenya?

16         A.  Uh-huh.

17         Q.  -- who was in her bedroom on her phone

18   with Ms. Galloway.  Ms. Chisholm was angered that

19   Ms. Galloway was still in contact with Sheenya,

20   and she picked up the phone to tell her daughter

21   to end the call.  It says you had a heated

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

210

1    conversation and -- with Ms. Galloway still on

2    the line.  You had a heated conversation with

3    your daughter with Ms. Galloway still on the

4    line.

5         A.  I told her to get off of the phone and

6    stop talking to her.

7         Q.  And so that's the one -- the 29th is the

8    one at work; is that correct?

9         A.  Yes.  It was -- yeah.

10             MR. HARTNETT:  No.  The 29th was at

11   home.

12             MS. JACKSON:  No.  When Ms. Galloway was

13   at work.

14             THE WITNESS:  That was in April.

15             MS. JACKSON:  April 3rd was the Sunday.

16             MR. HARTNETT:  Right.  Sorry.

17             THE WITNESS:  That was April.

18             MR. HARTNETT:  Right.  Sorry.  Right.

19             BY MS. JACKSON:

20        Q.  So on the 29th the conversation was just

21   between you and your daughter?

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

213

1    had voluntary, involuntary some many times, I

2    can't remember.

3        Q.  Is this from the bipolar?

4        A.  Her condition, you can't separate the

5    problems.  She has permanent emotional problems.

6    So I can't say she's got bipolar this day and

7    some other problem, it's all --

8        Q.  Together?

9        A.  Yeah.  Uh-huh.

10       Q.  Okay.  But she went in for all of her

11   emotional problems?

12       A.  Yes.

13       Q.  And you don't remember if it was

14   voluntary or involuntary?

15       A.  (Witness shakes head.)

16           MS. JACKSON:  You need a break?

17           THE WITNESS:  No.  No, I don't.

18       Q.  Now, on your -- what were you charged

19   with?

20       A.  Attempted threat of her life.

21       Q.  Okay.  And I gather you pled --

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

214

1    A.  Not guilty.

2    Q.  And agreed to a diversion program?

3    A.  Yes.  Eventually.  And the reason I did,

4    because I was back and forth to Richmond because

5    of my aunt.  I was going back and forth to the

6    hospital for my daughter.  And Mr. Evans, which

7    was my attorney at the time, told me that this

8    would make things go away.  I would not -- that

9    was what he had suggested doing.

10   Q.  Now, as part of the diversion program,

11   didn't you have to admit --

12   A.  No.

13   Q.  Let me finish the question.

14   A.  Uh-huh.

15   Q.  -- didn't you have to admit

16   responsibility for the --

17   A.  No.

18   Q.  -- not guilt, it's a different thing --

19   didn't you have to admit responsibility for the

20   charges that were lodged against you?

21   A.  No.

DEPOSITION OF RITA ELIZABETH CHISHOLM
Conducted on November 14, 2007

215

1    Q.  No.  They just let you go through it

2    without any admissions or acceptance --

3    A.  That's right.

4    Q.  -- of any responsibility?

5    A.  That's right.

6    MS. JACKSON:  Did you produce those

7    paper from the diversion program?

8    MR. HARTNETT:  I think we did, but I'm

9    make sure.

10   A.  Because I didn't do anything.

11   Q.  But you did go through diversion?

12   A.  That's what he had suggested doing.

13   Because of what I was going through.

14   Q.  Okay.  Now, you did file a complaint

15   with the Equal Employment Opportunity Commission,

16   correct?

17   A.  Yes.

18   Q.  What did they determine about your --

19   A.  That it was -- you ready for me to

20   speak?

21   Q.  Uh-huh.

EXHIBIT B

Page 61

1  cash handling.
2      Are there any other employees that you
3  recall that had any problems when it came to cash
4  handling, either accountability or performance or
5  possible misconduct?
6      A.  I can't think of any, sir.
7      Q.  Just before we went on break we were
8  talking about Ms. Galloway, and with my help you
9  had recalled it was about approximately November
10 of 2005 that she had been arrested.
11     A.  Yes.
12     Q.  Do you recall what the charges were?
13     A.  I don't.  I just recall that it had
14 something to do with perhaps some substances
15 perhaps being found on the premises and that it
16 related to perhaps a relative doing something on
17 her property is my vague recollection.  I think
18 the only thing I remember from that is that
19 nothing that I got from the arrest information
20 indicated anything to do with violence or
21 anything like that.

Page 62

1      Q.  So you did look at the arrest record?
2      A.  I spoke with the division director of
3  the criminal division concerning this because she
4  appeared on his docket information, and I didn't
5  actually -- I just asked him about that.
6      Q.  Asked him what?
7      A.  I asked him if there was anything to do
8  with violence.  The other concern I had frankly
9  had to do with the defender services program.
10 The courts manage the defender services program,
11 so I was concerned to make sure that information
12 was accurate.  In other words, working in the
13 same division where you have defender services, I
14 kind of wore a hat and I felt a little
15 responsibility to make sure that under the CJA
16 Act that everything had been entered correctly
17 and she was eligible and so forth and that all
18 the information had been provided accurately.
19     Q.  And this was in order to make sure that
20 she got representation if she needed it or what?
21     A.  No.  It was just to make sure that -- my

Page 63

1  concern was that certainly you want your
2  employees to be insulated from doing anything
3  that remotely would be perceived as inappropriate
4  because we're in charge of managing the defender
5  services monies, so I wanted to make sure that
6  any information about her employment was actually
7  included on there, and also, as I said, violence
8  was, you know, kind of a criminal activity, to
9  determine if there was anything that would create
10 maybe a hazard to our office.
11     Q.  Who was the criminal division director
12 that you spoke with?
13     A.  Dan Cipullo.
14     Q.  Dan?
15     A.  Dan Cipullo.
16     Q.  Can you spell it?
17     A.  C-I-P-U-L-L-O.
18     Q.  Do you know what happened with the
19 allegation against Ms. Galloway?
20     A.  As I understood, it was my understanding
21 that the charges were dropped.

Page 64

1      Q.  When did you learn that?
2      A.  Sometime in '06 maybe.
3      Q.  Did you determine exactly what the
4  charges were against her at that time or do you
5  recall them now or not?  Do you actually recall
6  what the charges were?
7      A.  I don't recall.  I'm sure someone had
8  mentioned and I had gotten some further, you
9  know, clarity in terms of what the charges were.
10 I don't recall exactly, and I don't want to
11 speculate on what those were.  I just remember
12 those two concerns I raised.
13     Q.  Did you ever speak with Ms. Galloway
14 about it?
15     A.  I spoke with her I think after she had
16 been released.  I don't remember exactly which
17 day.  It wasn't immediate.  It was within a few
18 days when she advised me -- she phoned me that
19 she had been arrested, and she communicated to me
20 right after she had been I guess released.
21     Q.  She called you right after she got

Page 65

1  released?
2    A.   Yes, sir.
3    Q.   What did she tell you?
4    A.   She indicated that these charges were
5  the result of I think a relative. I don't
6  remember if it was her son or former boyfriend or
7  somebody that owned the house had perhaps some
8  narcotics or some paraphernalia on site, and I
9  guess she was either present or something to that
10 effect. I don't recall if she told me it was her
11 home or not. I don't recall.
12   Q.   What did you do?
13   A.   I told her I would have to look into it
14 in the interest of, you know, representing the
15 interests of the court, and she was a little
16 emotional and very sorry it happened. I remember
17 her asking if she was going to lose her job, and
18 I said at this point it appears you most likely
19 will.
20   Q.   Why didn't she?
21   A.   Well, I told her I would have to look

Page 66

1  into the facts, and after I got some information
2  from Mr. Cipullo and I spoke with Mr. Luria and
3  so forth, I guess we determined that -- you know,
4  it was determined that we would suspend her.
5    Q.   So she was suspended?
6    A.   Yes, sir.
7    Q.   Who recommended her suspension?
8    A.   It was me.
9    Q.   How long was the suspension?
10   A.   If I would be permitted, I certainly
11 could retrieve my notes perhaps after lunch, but
12 I don't know exactly when right off the top of my
13 head. I'm sure I could go back and look.
14   Q.   I actually would like you to do that.
15   A.   Sure. Okay. I also moved her out of
16 the -- I guess upon her return from the
17 suspension I moved her out of the office, out of
18 the finance office.
19   Q.   So she is out of the finance office?
20   A.   No. She's back. After the charges were
21 dropped and she brought proof of that in I did

Page 67

1  move her back into the finance office.
2    Q.   I had understood that she was not there
3  any longer.
4    A.   Yes. For a long time she wasn't. I
5  moved her out because I thought that with the --
6  I guess you didn't ask me.
7    Q.   Go ahead. Why did you move her out of
8  the finance office?
9    A.   I moved her out because I was concerned
10 about I guess the appearance and the fact that I
11 didn't want her around cash if she did have
12 something to do with that, and so I thought she
13 would have to be in a very controlled environment
14 kind of isolated from the rest of the staff.
15   Q.   Where did you put her?
16   A.   I brought her across the street into the
17 Gallery Place location where I would supervise
18 her personally.
19   Q.   What were her duties?
20   A.   She did some reconciliations on some of
21 the accounts that we had. There were certain

Page 68

1  accounts, you know, large sums that I didn't want
2  her involved in, so she did some basic
3  reconciliations.
4    Q.   Approximately how long was that?
5    A.   Months. I'm not certain. I could get
6  that information right after lunch for you, sir.
7    Q.   Thank you. I would appreciate that.
8        MR. JACKSON: Before we go any further,
9  Dana has indicated that he was going to get
10 certain documents. I would like to have Toni
11 Jackson, who is the attorney of record, be made
12 aware of this and review any records that he may
13 bring back with him before they're produced for
14 you unless you can show that you actually asked
15 for these records in discovery. So I'll leave
16 that up to Toni to decide.
17       MR. HARTNETT: I believe it would have
18 been covered by one of our requests. I have no
19 objection to your proposal there.
20   Q.   When you were considering how to handle
21 this situation with Ms. Galloway, did that

EXHIBIT C



THE DISTRICT OF COLUMBIA COURTS
515 5th Street, N.W., Room 116
WASHINGTON, D.C. 20001-2131



Anthony H. Rainey
*Chief Financial Officer*
Budget and Finance Division
202-879-2806
(FAX) 202-879-2894
(E-Mail) Raineya@dcsc.gov

### MEMORANDUM

**TO:** Anne B. Wicks
Executive Officer

**FROM:** Anthony H. Rainey
Chief Financial Officer

**SUBJECT:** Recommendation for Termination
Rita Chisholm, Officer Clerk

**DATE:** June 30, 2005

I am herewith tendering my recommendation for the termination of Rita Chisholm, Office Clerk. My recommendation is based upon the documentation, memoranda, and witness corroboration that we have received in connection with threats that Ms. Chisholm reportedly made to Jennifer Galloway, Accounting Technician. In connection with the foregoing, it should be noted that at least one of these disturbing threats was overheard by several of Ms. Galloway's colleagues over the Courts' telephone during normal working hours.

In making my recommendation, I have read and carefully considered the response of Ms. Chisholm dated June 1st (there were none of the attachments referred to in the letter), as well as the responses from her lawyer, William Rhodes, the most recent of which was dated June 10, 2005. In his initial response dated May 3rd, Mr. Rhodes says his client never called Ms. Galloway either at home or in the office, Ms. Chisholm admits in her response that on April 3rd she had interrupted a telephone conversation between her daughter and Ms. Galloway and had "profane words" with her though she denies making a threat. In her response, she did not address the March 29th telephone call made to Ms. Galloway at work and overheard by other employees and continued to deny the existence of any such calls.

Ms. Galloway has been closely questioned about the various allegations contained in the June 1st letter and denies them. Nothing known of Ms. Galloway's conduct and character would suggest that she is anything less than truthful.

018

2

It should also be noted that both Ms. Chisholm and her attorney, Mr. Rhodes suggest that Ms. Chisholm's letters (characterized as "grievances" and/or "complaints") to Cyril Erugo, Chief, Banking and Finance Branch, and to Dana Friend, Deputy Chief Financial Officer, in which she made some complaints against Ms. Galloway and sought relief in the form of a "detail from Criminal Finance Office", were disregarded.    On the contrary, Mr. Friend not only spoke with a member of *COPE, Inc.* (the vendor that provides services under the Employee Assistance Program) who phoned him with respect to Ms. Chisholm's concerns, but also spoke with Ms. Chisholm directly in an effort to gather facts and information and to discuss options to address Ms. Chisholm's assertions (Ms. Chisholm acknowledges and even thanks Mr. Friend in her letter to him dated March 22, 2005 – copy attached herewith).

Lastly, Ms. Chisholm is the subject of an order instructing her to remain at least 100 yards from Ms. Galloway at all times including their place of employment. The order was signed on April 26, 2005 by Magistrate Judge Hugh Stevenson (Case No. M4017-05).    This order makes her employment here untenable as she works within a short distance of Ms. Galloway and no alternative arrangement is practicable.    For all the above reasons, and even in the absence of this order, I would recommend that this employee be terminated for violation of Personnel Policy 1001 B Level 1 (7).  Her continued presence would pose a threat to the well-being, safety and morale of Ms. Galloway and other employees and would adversely impact the efficiency of the Banking and Finance Branch.  Ms. Chisholm was instructed to remain out of the office on Administrative Leave (she is currently in pay status and has been since May 2005) pending the disposition of this matter.

cc: Dana A. Friend
    Deputy Chief Financial Officer

    Cyril Erugo
    Chief, Finance and Banking Branch

Attachments

019



THE DISTRICT OF COLUMBIA COURTS



Anthony H. Rainey
*Chief Financial Officer*
Budget and Finance Division
202-879-2806
(FAX) 202-879-2894
(E-Mail) Raineya@dcsc.gov

## MEMORANDUM

**TO:** Rita Chisholm
Office Clerk

**FROM:** Anthony H. Rainey
Chief Financial Officer

**SUBJECT:** Recommendation for Termination

**DATE:** July 25, 2005

I am in receipt of a memorandum from the Executive Officer dated July 14, 2005, approving your termination from employment with the District of Columbia Courts. Accordingly, effective upon the close of business Friday, August 5, 2005, you are hereby terminated.

Any further remedies that may be available under the District of Columbia Courts' Comprehensive Personnel Policies should be addressed pursuant to Personnel Policy No. 1007 (copy attached).

ATTACHMENTS

Cc: Anne B. Wicks, Executive Officer
Fred Horowitz, Director, Human Resources
Dana Friend, Deputy Chief Financial Officer
Cyril Erugo, Chief, Finance and Banking Branch

000276

EXHIBIT D

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

## BUDGET AND FINANCE   - BANKING AND FINANCE BRANCH

**DATE:** November 5, 2004

## OFFICE MEMORANDUM

**To:**        Rita Chisholm, Office Clerk

**From:**     Cyril O. Erugo, Branch Chief

**Subject:**   Physician recommendation on ailment

We are in receipt of your doctor's recommendation regarding your health problem.  As we previously discussed, for now, we will allow you a 5 minutes rest for every 15 minutes worked on the computer.  Since this is a temporary arrangement, you will be required to regularly apprise us on the progress of the treatment and the doctor's expectation of when the treatment would end.

The staff members wish you speedy recovery.

CC: Margarita Durham
     Jennifer Galloway

EXHIBIT R

**Metropolitan Police Department**

*Roselta*    24/9  05-2101
Washington, D.C.

PART I. CLASSIFICATION OF EVENT

| TYPE OF REPORT | DATE AND TIME OF EVENT | | | | | DATE OF REPORT | TIME OF REPORT | | COMPLAINT NUMBER |
|---|---|---|---|---|---|---|---|---|---|

○ Offense
○ Incident

**FILL IN THE OVALS COMPLETELY**

Start Date: 0 3 0 5  Start Time: 1 3 3 7

DATE OF REPORT: 0 4 0 5  TIME: 1 3 7

Right Mark / Wrong Mark

**EVENT LOCATION ADDRESS**
500 Indiana Ave NW

Floor of / In front of / Along side of / ● Inside of
NW Corner / NE Corner / SW Corner / SE Corner

**EVENT NO. 1**
Felony Threats

**EVENT NO. 2**
05 APR 2005

| FORCED ENTRY | POINT OF ENTRY | | |
|---|---|---|---|
| ○ Yes ● No | N/A | b. Method Used: Threats | b. Tools Used: Telephone |

**WEATHER CONDITIONS**
○ Clear ○ Rain ○ Other
○ Cloudy ○ Snow ● Not applicable ○ Unknown

**SUSPECTED HATE CRIME?**
● None ○ Ethnic ○ Sexual Orientation
○ Racial ○ Religious ○ Other

**SECURITY SYSTEM (Mark all that apply)**
○ Alarm/Audio ○ Camera ○ Dead bolt ○ Exterior lights ○ Fence ○ Neighborhood watch ● Not applicable
○ Alarm/Silent ○ Dog ○ Unlocked ○ Interior lights ○ Guard ○ Other ○ Unknown

**LOCATION TYPE (Mark only one)**
○ Air/Bus/Train terminal
○ Alley
○ Bank/Savings & loan
○ Bus stop
○ Church/Synagogue/Temple
○ College/University
○ Commercial office building
○ Construction site
○ Convenience store
○ Department/Discount store
● D.C. government building

○ Doctor's office/Hospital
○ Drug store
○ Federal/Government bldg.
○ Field/Woods
○ Grocery/Supermarket
○ Hotel/Motel/Etc.
○ Jail/Prison
○ Lake/Waterway
○ Liquor store
○ Park area
○ Parking lot/Parking garage
○ Public housing project

○ Public/Private school
○ Rental storage facility
○ Residence/Home
○ Restaurant
○ Service station
○ Sidewalk
○ Specialty store
○ Street/Highway/Road
○ Tavern/Night club
○ Other
○ Not applicable
○ Unknown

**DESIGNATED AREAS (Mark all that apply)**
○ Victim's vehicle
○ Suspect's vehicle
○ Taxi-cab
○ Bus
○ Train/Metro/Amtrak/Etc.
○ Hallway
○ Elevator
○ Stairwell
○ Basement/Laundry room
○ Apartment/Condo unit
○ Single family dwelling
○ Hotel/Motel room
○ College/University dorm
○ Classroom
● Office room
○ Vacant building/room
○ Customer area
○ Storage area
○ In public
○ With 1/4 block of public housing
○ With 1,000 ft. of school
○ Other
○ Not applicable
○ Unknown

PART II. VICTIM INFORMATION

**NAME OF COMPLAINANT/VICTIM/MISSING PERSON NO. 1**
Galloway, Jennifer

**VICTIM TYPE**
● Individual ○ Financial Inst. ○ Religious org. ○ Police officer
○ Business ○ Government ○ Society/Public ○ Other

| DATE OF BIRTH | AGE RANGE | SEX | HOME PHONE |
|---|---|---|---|
| 2 2 7 1 | ○ 0-1 yr. ○ 2-12 yrs. ○ 13-17 yrs. ● 18-65 yrs. ○ Over 65 | ○ Male ● Female ○ Unknown | (202) 269-9577 |

BUSINESS PHONE
(202) 879-0142

**RACE/ETHNICITY (Mark all that apply)**
○ American Indian/Alaskan Native ○ Japanese
○ Asian/Pacific Islander ○ Korean
● Black ○ Vietnamese
○ Chinese ○ White
○ Latino/Hispanic ○ Other
○ Jamaican ○ Unknown/Refused

**HOME ADDRESS**  ● DC Resident ○ Non-DC Resident ○ Unknown
3424 Summit Ct NE, Washington DC
20018

**BUSINESS ADDRESS/SCHOOL**
500 Indiana Ave 4203 NW
Washington, DC

| OCCUPATION | IS EVENT RELATED TO OCCUPATION? |
|---|---|
| Account Technician | ○ Yes ● No ○ Unknown |

ADDITIONAL MEANS TO CONTACT COMPLAINANT/VICTIM NO. 1

**STATUS (Mark one)**
○ Open ○ Closed ○ Closed by arrest attach PD-252
○ Unfounded ○ Suspended

REVIEWER

DISTRIBUTION

I-251  4/99

000125

IS VICTIM #1 THE REPORTING PERSON? IF NO, ENTER THE NAME, ADDRESS AND PHONE NUMBER OF THE REPORTING PERSON.
○ Yes  ○ No

Name: _____  Phone-Area Code: _____

Address: _____

DID THE REPORTED EVENT OCCUR AS A RESULT OF AN INTRA-FAMILY MATTER?
○ Yes  ● No

WAS PD FORM 379A ISSUED?
○ Yes  ● No

IS CPO/TPO OUTSTANDING?
○ Yes  ● No  ○ Unknown   IF YES, ENTER CPO/TPO #:

**INJURIES** Use the following codes to describe injuries. (Mark all that apply)

N = None Visible
M = Apparent Minor Injury
B = Apparent Broken Bones

Q = Other Major Injury
I = Possible Internal Injury
G = Gunshot

L = Severe Laceration
T = Loss of Teeth
U = Unconscious

| INJURED | NUMBER | INJURY CODE | DESCRIBE INJURY | WHERE TAKEN | BY WHOM | DOA? ARR. | STATUS |
|---------|--------|-------------|-----------------|-------------|---------|-----------|--------|
| ○ Victim | | | | | | ○ Yes ○ No | ○ Admitted ○ Related |
| ○ Suspect | | | | | | ○ Yes ○ No | ○ Admitted ○ Related |
| ○ Victim | | | | | | ○ Yes ○ No | ○ Admitted ○ Related |
| ○ Suspect | | N | | | | ○ Yes ○ No | ○ Admitted ○ Related |
| ○ Victim | | A | | | | ○ Yes ○ No | ○ Admitted ○ Related |
| ○ Suspect | | | | | | ○ Yes ○ No | ○ Admitted ○ Related |
| ○ Victim | | | | | | ○ Yes ○ No | ○ Admitted ○ Related |
| ○ Suspect | | | | | | ○ Yes ○ No | ○ Admitted ○ Related |

**PART II PROPERTY**

Codes: S = Stolen  E = Evidence  R = Recovered  F = Found  I = Impounded  V = Vehicle from which theft occurred  L = Lost  P = Suspected proceeds of crime  O = Other

a. Property Book & Page No.

b. Location of Property Book

| Code | Description of Item(s) | Serial Number/ Operation ID No. | Model No. | Color | Size | Quantity | Comp. Value | Age | NPDC Value |
|------|----------------------|-------------------------------|-----------|-------|------|----------|-------------|-----|------------|
| | N | | | | | | | | |
| | A | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**VEHICLE INFORMATION**  Vehicle operated/used by: ○ Victim  ○ Suspect  ○ Victim's vehicle taken by suspect

| Code | Year | Make | Model | Color | Body | Tag No./State/Year | VIN |
|------|------|------|-------|-------|------|-------------------|-----|
| | N/A | | | | | | |

**PART IV SUSPECT/MISSING PERSON INFORMATION** (Use separate additional sheet if needed)

**#1**
○ Suspect  ○ Missing
a. Race: ○ Asian ○ White ● Black ○ Latino/Hispanic ○ Unknown ○ Other
b. Sex: ● Male ○ Female ○ Unknown
c. Exact Age or Range: Mid 50's
d. Height: 6'4"
e. Weight: 200
f. Eyes: Bro
g. Hair: Blk

h. Complexion: Med   i. Scars: Unk   j. Mustache: N/A   k. Facial Hair: N/A   l. Hat: Unk   m. Coat/Jacket: Unk   n. Pants: Unk   o. Blouse/Shirt: Unk
p. Perpetrator Suspected of Using: ○ Alcohol ○ Drugs ○ Computer ● N/A

Firearm: ○ Handgun ○ Shotgun ○ Other firearm ○ Revolver ○ Semi-automatic ○ Rifle ○ Automatic
Other: ○ Cutting instrument ○ Hands/Feet/Teeth ○ Other (specify) ○ Blunt object ○ None ○ Motor vehicle ○ Unknown
q. Weapons Used in Offense (Mark all that apply)

Color | Make | Model | Caliber

**#2**
○ Suspect  ○ Missing
a. Race: ○ Asian ○ White ○ Black ○ Latino/Hispanic ○ Unknown ○ Other
b. Sex: ○ Male ○ Female ○ Unknown
c. Exact Age or Range:
d. Height:
e. Weight:
f. Eyes:
g. Hair:

h. Complexion:   i. Scars:   j. Mustache:   k. Facial Hair:   l. Hat:   m. Coat/Jacket:   n. Pants:   o. Blouse/Shirt:
p. Perpetrator Suspected of Using: ○ Alcohol ○ Drugs ○ Computer ○ N/A

Firearm: ○ Handgun ○ Shotgun ○ Other firearm ○ Revolver ○ Semi-automatic ○ Rifle ○ Automatic
Other: ○ Cutting instrument ○ Hands/Feet/Teeth ○ Other (specify) ○ Blunt object ○ None ○ Motor vehicle ○ Unknown
q. Weapons Used in Offense (Mark all that apply)

Color | Make | Model | Caliber

**#3**
○ Suspect  ○ Missing
a. Race: ○ Asian ○ White ○ Black ○ Latino/Hispanic ○ Unknown ○ Other
b. Sex: ○ Male ○ Female ○ Unknown
a. Exact Age or Range:
d. Height:
e. Weight:
f. Eyes:
g. Hair:

h. Complexion:   i. Scars:   j. Mustache:   k. Facial Hair:   l. Hat:   m. Coat/Jacket:   n. Pants:   o. Blouse/Shirt:
p. Perpetrator Suspected of Using: ○ Alcohol ○ Drugs ○ Computer ○ N/A

Firearm: ○ Handgun ○ Shotgun ○ Other firearm ○ Revolver ○ Semi-automatic ○ Rifle ○ Automatic
Other: ○ Cutting instrument ○ Hands/Feet/Teeth ○ Other (specify) ○ Blunt object ○ None ○ Motor vehicle ○ Unknown
q. Weapons Used in Offense (Mark all that apply)

Color | Make | Model | Caliber

*Value of vehicles to be entered by Information Processing section

CCN: 042039

PAGE 2

009126

PART V - MISSING PERSONS

PROBABLE CAUSE OF ABSENCE AND DESTINATION

COMPLAINT NUMBER

0 4 2 0 3

IF MISSING PERSON HAS RUN AWAY BEFORE, GIVE DATE AND WHERE LOCATED:    CLASSIFICATION    CLASSIFIED BY:

○ Critical
○ Non-critical

PHYSICAL/MENTAL CONDITION (i.e., diabetic)    DESCRIBE ARTICLES OF JEWELRY WORN AND IDENTIFICATION CARRIED    NAME OF PARENT/GUARDIAN

ADDRESS OF PARENT/GUARDIAN    IF JUVENILE, ENTER MOTHER'S MAIDEN NAME    MISSING PERSON SECTION NOTIFIED (Name)

NARRATIVE    Describe event and action taken. If additional narrative space is needed, use PD Form 251-A.

| Item Number/Continued | |
|---|---|
| | C-1 reported on the listed date and time S-1 called her and stated "Bitch get off my phone, I'm gonna kill you. I'm gonna get you You Fucking Bitch. I'm gonna get you You Black Bitch, I'm gonna get you if its the last thing I do. I promise you I'm gonna get you. |

EVIDENCE TECHNICIAN/CSES #    NAME OF INVESTIGATOR NOTIFIED    TELETYPE NOTIFIED (Name)    TELETYPE

REPORTING OFFICER'S SIGNATURE    ELEMENT    OTHER POLICE AGENCY (Indicate if report prepared by officer other than RO)    SECOND OFFICER'S NAME    BADGE NUMBER    ELEMENT    SIGNATURE OR SUPERVISOR    ELEM

10    ○ USCP
○ USSS
○ METRO TRANSIT
○ OTHER

SGT.

BADGE NUMBER    BADGE NUMBER    BADGE NUMBER

**PART VI ADDITIONAL INFORMATION** (Use PD Form 251-C for additional victims or suspects.)

| NAME OF COMPLAINANT/VICTIM/MISSING PERSON NO. 1 | RELATED TO EVENT NO(S) |
|---|---|

### VICTIM TYPE
- Individual
- Business
- Financial Inst.
- Government
- Religious org.
- Society/Public
- Police officer
- Other

| DATE OF BIRTH | AGE RANGE | SEX | HOME PHONE |
|---|---|---|---|
| Unknown / NA | | | ( ) |

Month | Day | Year

AGE RANGE:
- 0-1 yr.
- 2-12 yrs.
- 13-17 yrs.
- 18-65 yrs.
- Over 65

SEX:
- Male
- Female
- Unknown

**BUSINESS PHONE** ( )

### RACE/ETHNICITY (Mark all that apply)
- American Indian/Alaskan Native
- Asian/Pacific Islander
- Black
- Chinese
- Latino/Hispanic
- Jamaican
- Japanese
- Korean
- Vietnamese
- White
- Other
- Unknown/Refused

**HOME ADDRESS** — DC Resident / Non-DC Resident / Unknown

**BUSINESS ADDRESS/SCHOOL**

**OCCUPATION** | **IS EVENT RELATED TO OCCUPATION?** — Yes / No / Unknown

**ADDITIONAL MEANS TO CONTACT COMPLAINANT/VICTIM NO. 1**

---

| NAME OF COMPLAINANT/VICTIM/MISSING PERSON NO. 1 | RELATED TO EVENT NO(S) |
|---|---|

### VICTIM TYPE
- Individual
- Business
- Financial Inst.
- Government
- Religious org.
- Society/Public
- Police officer
- Other

| DATE OF BIRTH | AGE RANGE | SEX | HOME PHONE |
|---|---|---|---|
| Unknown / NA | | | ( ) |

AGE RANGE:
- 0-1 yr.
- 2-12 yrs.
- 13-17 yrs.
- 18-65 yrs.
- Over 65

SEX:
- Male
- Female
- Unknown

**BUSINESS PHONE** ( )

### RACE/ETHNICITY (Mark all that apply)
- American Indian/Alaskan Native
- Asian/Pacific Islander
- Black
- Chinese
- Latino/Hispanic
- Jamaican
- Japanese
- Korean
- Vietnamese
- White
- Other
- Unknown/Refused

**HOME ADDRESS** — DC Resident / Non-DC Resident / Unknown

**BUSINESS ADDRESS/SCHOOL**

**OCCUPATION** | **IS EVENT RELATED TO OCCUPATION?** — Yes / No / Unknown

**ADDITIONAL MEANS TO CONTACT COMPLAINANT/VICTIM NO. 1**

---

### #1
- Suspect
- Missing

**a. Race:** Asian / Black / White / Latino/Hispanic / Unknown / Other
**b. Sex:** Male / Female / Unknown
**c. Exact Age or Range** | **d. Height** | **e. Weight** | **f. Eyes** | **g. Hair**

| h. Complexion | i. Scars | j. Mustache | k. Facial Hair | l. Hat | m. Coat/Jacket | n. Pants | o. Blouse/Shirt | p. Perpetrator Suspected of Using |
|---|---|---|---|---|---|---|---|---|

p. Perpetrator Suspected of Using: Alcohol / Drugs / Computer / N/A

**q. Weapons Used in Offense (Mark all that apply)**

Firearm: Handgun / Revolver / Rifle / Shotgun / Semi-automatic / Automatic / Other firearm
Other: Cutting instrument / Blunt object / Motor vehicle / Hands/Feet/Teeth / None / Unknown / Other (specify)
Color | Make | Model | Caliber

### #2
- Suspect
- Missing

**a. Race:** Asian / Black / White / Latino/Hispanic / Unknown / Other
**b. Sex:** Male / Female / Unknown
**c. Exact Age or Range** | **d. Height** | **e. Weight** | **f. Eyes** | **g. Hair**

| h. Complexion | i. Scars | j. Mustache | k. Facial Hair | l. Hat | m. Coat/Jacket | n. Pants | o. Blouse/Shirt | p. Perpetrator Suspected of Using |
|---|---|---|---|---|---|---|---|---|

p. Perpetrator Suspected of Using: Alcohol / Drugs / Computer / N/A

**q. Weapons Used in Offense (Mark all that apply)**

Firearm: Handgun / Revolver / Rifle / Shotgun / Semi-automatic / Automatic / Other firearm
Other: Cutting instrument / Blunt object / Motor vehicle / Hands/Feet/Teeth / None / Unknown / Other (specify)
Color | Make | Model | Caliber

### #3
- Suspect
- Missing

**a. Race:** Asian / Black / White / Latino/Hispanic / Unknown / Other
**b. Sex:** Male / Female / Unknown
**c. Exact Age or Range** | **d. Height** | **e. Weight** | **f. Eyes** | **g. Hair**

| h. Complexion | i. Scars | j. Mustache | k. Facial Hair | l. Hat | m. Coat/Jacket | n. Pants | o. Blouse/Shirt | p. Perpetrator Suspected of Using |
|---|---|---|---|---|---|---|---|---|

p. Perpetrator Suspected of Using: Alcohol / Drugs / Computer / N/A

**q. Weapons Used in Offense (Mark all that apply)**

Firearm: Handgun / Revolver / Rifle / Shotgun / Semi-automatic / Automatic / Other firearm
Other: Cutting instrument / Blunt object / Motor vehicle / Hands/Feet/Teeth / None / Unknown / Other (specify)
Color | Make | Model | Caliber

000123

CCN _____    PAGE 4

# Superior Court ot the District of Columbia

## CRIMINAL DIVISION

| AFFIDAVIT IN SUPPORT OF AN ARREST WARRANT | U S W No.: 427-05 | |
|---|---|---|

| DEFENDANT'S NAME: HISHOLM, RITA | C C R: 05-042039 | PDID: |
|---|---|---|

| EX: EMALE | RACE: BLACK | D.O.B.: 08/14/1947 | HEIGHT: 64 | WEIGHT: 200 | EYES: BROWN | HAIR: BLACK | COMPLEXION: MEDIUM |
|---|---|---|---|---|---|---|---|

| DEFENDANT'S HOME ADDRESS: 221 SOUTH . #21 , ARLINGTON , VIRGINIA, 22204 | TELEPHONE NUMBER: |
|---|---|

| DEFENDANT'S BUSINESS ADDRESS: | TELEPHONE NUMBER: |
|---|---|

| COMPLAINANT'S NAME: ALLOWAY, JENNIFER |
|---|

| LOCATION OF OFFENSE: NEW JERSEY AVENUE, N.W., WDC | DATE OF OFFENSE: 04/03/2005 | TIME OF OFFENSE: 13:37 |
|---|---|---|

IVE BRIEF DESCRIPTION OF WHAT HAPPENED:

HE COMPLAINANT REPORTED TO THE METROPOLITAN POLICE DEPARTMENT THAT ON APRIL 03, 2205, AT PPROXIMATELY 1337 HOURS, SHE WAS THREATEN BY THE DEFENDANT OVER HER CELLULAR TELEPHONE. THE FFENSE OCCURRED

N INVESTIGATION WAS CONDUCTED INTO THIS OFFENSE. THE COMPLAINANT WAS INTERVIEWED ON APRIL 12, 005, AT APPROXIMATELY 1330 HOURS. THE COMPLAINANT STATED THE DEFENDANT CALLED HER CELLULAR ELEPHONE WHILE SHE WAS IN THE AREA OF NEW JERSEY AVE, NW, THE COMPLAINANT ANSWERED IT AND THE DEFENDANT STATED TO HER "BITCH.GET OFF MY PHONE. I'M GONNA KILL YOU. I'M GONNA GET YOU. YOU FUCKING ITCH. I'M GONNA GET YOU, YOU BLACK BITCH, I'M GONNA GET YOU IF ITS THE LAST THING I DO. I PROMISE YOU M GONNA GET YOU. THE COMPLAINANT AND THE DEFENDANT WORK TOGETHER AT 500 INDIANA AVENUE NW, IN HE FINANCE AND BANKING DEPARTMENT. THE DEFENDANT WAS IDENTIFIED AS CHISHOLM, RITA, DATE OF BIRTH F APRIL 14, 1947, ADDRESS OF 4221 SOUTH 12 ROAD #21, ARLINGTON VA 22204. THE COMPLAINANT HAS KNOWN HE DEFENDANT FOR APPROXIMATELY TWO AND A HALF YEARS.

W-1 WAS INTERVIEWED ON APRIL 14, 2005, AT APPROXIMATELY 0830, W-1 STATED THAT SHE WAS WITH THE COMPLAINANT AND HEARD HER HAVING A CONVERSATION WITH THE DEFENDANT. W-1 COULD HEAR THE DEFENDANT SCREAMING FROM THE TELEPHONE. W-1 THEN HEARD THE COMPLAINANT REPLIED OVER THE ELEPHONE TO THE DEFENDANT ARE YOU THREATING ME. W-1 TOLD THE COMPLAINT TO GIVE HER THE ELEPHONE AND PUT THE RECEIVED TO HER EAR. W-1 THEN HEARD THE DEFENDANT SAY "I'M GOING TO GET YOU ITCH, I'M GOING TO GET YOU". W-1 THEN ASKED THE DEFENDANT WHY WAS SHE TALKING LIKE THIS, THE DEFENDANT DIDN'T REPLIED. IT WAS A SILENCE ON THE TELEPHONE BUT W-1 COULD HEAR NOISE IN THE BACK GROUND AS IF THE TELEPHONE LINE WAS STILL OPEN. W-1 THEN GAVE THE TELEPHONE BACK TO THE COMPLAINANT.

ASED ON THE LISTED FACTS AND CIRCUMSTANCES, I REQUEST THAT A DC SUPERIOR COURT JUDGE ISSUED AN RREST WARRANT FOR THE DEFENDANT, CHARGING HER ACCORDINGLY.

| O: WARRANT CLERK | AFFIANT'S SIGNATURE: |
|---|---|
| LEASE ISSUE A WARRANT FOR: HISHOLM, RITA | x _Jenita Eggleston_ |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ |
| harge With: _Threats (M)_ | _14th_ DAY OF _April_ 20 _05_ |
| _Timoka W. Law_ | _Bruce D. Beaudin_ |
| ASSISTANT UNITED STATES ATTORNEY | (JUDGE) (DEPUTY CLERK) SUPERIOR COURT |
| _NO NCIC_ | |

Page 1 of 1 pages

000129

EXHIBIT F

(41)

| METROPOLITAN POLICE DEPARTMENT Washington, D.C. ARREST/PROSECUTION REPORT P.D.163 Rev 08/00 | 1. PERSON NOTIFIED OF NAME CHANGE - UNIT - DATE -/TIME (ID Only) | 2. PDID NUMBER 573090 |
|---|---|---|
| | 3. DEFENDANT'S TRUE NAME - LAST, FIRST, MIDDLE (ID Only) | 4. CID NUMBER 1DDU05-2101 |
| 5. UNIT ARREST NUMBER 010501936 | 6. DEFENDANT'S NAME - LAST, FIRST, MIDDLE (At time of arrest) CHISHOLM, RITA | 7. DEA LAB NUMBER |
| 8. Arresting Officer's Name EGGLESTON, J | 9. TYPE OF | 10. NICKNAME / ALIAS ► | 11. PHONE NUMBER |
| Rank  Badge#  Agency DET D2-189 1D | 12. COURT DATE 4/26/2005 | 13. ADDRESS ► | LIFE |
| | | 18. BIRTHDATE ► 08/14/1947 | 19. SOCIAL SECURITY NUMBER |

| 15. SPECIAL INTELLIGENCE | | | | | 17. FEMALE | ► BLACK | | 27. BIRTHPLACE Richmond VA |
|---|---|---|---|---|---|---|---|---|
| ☐ CHILD ABUSE | ☐ GANG | ☐ HATE | ☐ SENIOR CITIZEN | ☐ DOMESTIC VIOLENCE | ► FEMALE | ► BLACK | 08/14/1947 | |

| 20. NEED INTERPRETER NO | 21. HEIGHT 511 | 22. WEIGHT 200 | 23. HAIR BLACK | 24. EYES BROWN | 25. COMPLEX DARK/TAN | 26. PERMIT NO / ST | 29. CAUTION |
|---|---|---|---|---|---|---|---|
| | | | | | 28. IMPERSONATOR ? NOT APPLICABLE | 30. ETHNICITY afro-american | |

| 31. CO-DEFENDANT'S Number:  0 NAME, ADDRESS, ZIP CODE AND PHONE NUMBER | 32. SCARS / MARKS / TATTOOS | | |
|---|---|---|---|
| | 33. TIE N/A | 34. JACKET PURPLE | 35. PANTS PURPLE |
| | 36. COAT BLACK | 37. SHIRT BLACK | 38. SKIRT / DRESS N/A |

| | 39. WHALES / NCIC CHECK | |
|---|---|---|
| CHECK MADE BY (Name) Harris | NCIC NUMBER 98306 | WARRANT ON FILE (If Yes, enter Warrant Number(s).) YES US 427-05 |

| 40. LOCATION OF OFFENSE ► NEW JERSEY AVENUE NW, Washington, DISTRICT OF COLUMBIA | DATE OF OFFENSE ► 04/03/2005 | TIME OF OFFENSE ► 1:37 PM |
|---|---|---|
| 41. LOCATION OF ARREST ► 415 4TH ST SW, Washington, DISTRICT OF COLUMBIA, 20024 | DATE OF ARREST ► 04/26/2005 | TIME OF ARREST ► 7:00 AM |
| 42. ASSISTING OFFICER'S NAME, RANK, BADGE NO. & UNIT OR AGENCY ► EGGLESTON, JUANITA L, DET, D2-189, 1DDU | ASSISTING OFFICER'S NAME, RANK, BADGE NO. & UNIT OR AGENCY | |

| 43. DEFENDANT ADVISED OF RIGHTS | | | |
|---|---|---|---|
| | OFFICER'S NAME - ADVISING / COMPLETING PD FORM 47/47A | BADGE NO. | UNIT |
| DATE | TIME | LOCATION | |

| 44. COMPLAINANTS / WITNESSES | | | | |
|---|---|---|---|---|
| NAME - LAST, FIRST, M | ADDRESS - STREET, CITY, STATE, ZIP CODE | BIRTHDATE | HOME PHONE NO. | WORK PHONE NO. |
| W-1 ► | | | | |
| W-2 ► | | | | |

| 45. SPEC. OPS. | 46. TACTICS ARREST WARRANT | 47. PREMISES GOVERNMENT BUILDING | 48. ☐ SCHOOL ZONE ☐ PUBLIC HOUSING |
|---|---|---|---|

| 49. CHARGES (Enter lead charge first) | NOI OR WARRANT NUMBER | CCN | MPD DISPOS. | COLLA / BOND RECEIPT NO. |
|---|---|---|---|---|
| THREATS TO DO BODILY HARM | US 427-05 Served | 05-042039 | LOCK UP | |

| 50. PROPERTY RECOVERED / ITEMS OF EVIDENCE | 51. INITIALS - DATE - UNIT OF PERSON TAKING PRINT | 53. RIGHT THUMB PRINT |
|---|---|---|
| PROPERTY BOOK / PAGE 138/21 | CSES NO. | |
| | 52. M. O. WEAPONS, HANGOUTS, HABITS, INSTRUMENTS | |

2005 APR 26 A 10: 34

Distribution: ☐ ID & RD;  ☐ Prosecutor;  ☐ Unit Copy;  ☐ Officer's Copy

Page  1  of  2  pages

| 55. EMPLOYMENT HISTORY (List present employment if any, on Line 1) | | | | |
|---|---|---|---|---|
| DATE FROM | TO | EMPLOYER | ADDRESS | BUS. PHONE | OCCUPATION |
| 19 1/2 yrs | | Dist Gov't | Sea Indiana Ave NW | 847-0376 | Clerical |

| 56. NAMES OF LIVING FAMILY, RELATIVES, FRIENDS, AND ASSOCIATES | | | | |
|---|---|---|---|---|
| RELATIONSHIP | DOB / AGE | NAME - LAST, FIRST, M.I. | ADDRESS - STREET, CITY, STATE, ZIP CODE | PHONE NUMBER |
| Cousin | 44 | Mary Craddock | Alexandria VA | 7/601-1270 |

| 57. MILITARY SERVICE: BRANCH / DATE FROM - TO | 58. TELEPHONE CALL MADE | 59. PHONE NUMBER |
|---|---|---|
| N/A | yes | 7/601-1270 |

**60. STATEMENT OF FACTS:**

THE COMPLAINANT REPORTED TO THE METROPOLITAN POLICE DEPARTMENT THAT ON APRIL 03, 2205, AT APPROXIMATELY 1337 HOURS, SHE WAS THREATEN BY THE DEFENDANT OVER HER CELLULAR TELEPHONE. THE OFFENSE OCCURRED

AN INVESTIGATION WAS CONDUCTED INTO THIS OFFENSE. THE COMPLAINANT WAS INTERVIEWED ON APRIL 12, 2005, AT APPROXIMATELY 1330 HOURS. THE COMPLAINANT STATED THE DEFENDANT CALLED HER CELLULAR TELEPHONE WHILE SHE WAS IN THE AREA OF NEW JERSEY AVE, NW, THE COMPLAINANT ANSWERED IT AND THE DEFENDANT STATED TO HER "BITCH GET OFF MY PHONE, I'M GONNA KILL YOU. I'M GONNA GET YOU. YOU FUCKING BITCH. I'M GONNA GET YOU, YOU BLACK BITCH, I'M GONNA GET YOU IF ITS THE LAST THING I DO. I PROMISE YOU I'M GONNA GET YOU. THE COMPLAINANT AND THE DEFENDANT WORK TOGETHER AT 500 INDIANA AVENUE NW, IN THE FINANCE AND BANKING DEPARTMENT. THE DEFENDANT WAS IDENTIFIED AS CHISHOLM, RITA, DATE OF BIRTH OF ~~█████████████████████~~ THE COMPLAINANT HAS KNOWN THE ~~DEFENDANT FOR APPROXIMATELY TWO AND A HALF YEARS.~~

W-1 WAS INTERVIEWED ON APRIL 14, 2005, AT APPROXIMATELY 0830, W-1 STATED THAT SHE WAS WITH THE COMPLAINT AND HEARD HER HAVING A CONVERSATION WITH THE DEFENDANT. W-1 COULD HEAR THE DEFENDANT SCREAMING FROM THE TELEPHONE. W-1 THEN HEARD THE COMPLAINANT REPLIED OVER THE TELEPHONE TO THE DEFENDANT ARE YOU THREATING ME. W-1 TOLD THE COMPLAINT TO GIVE HER THE TELEPHONE AND PUT THE RECEIVED TO HER EAR. W-1 THEN HEARD THE DEFENDANT SAY "I'M GOING TO GET YOU BITCH, I'M GOING TO GET YOU". W-1 THEN ASKED THE DEFENDANT WHY WAS SHE TALKING LIKE THIS, THE DEFENDANT DIDN'T REPLIED. IT WAS A SILENCE ON THE TELEPHONE BUT W-1 COULD HEAR NOISE IN THE BACK GROUND AS IF THE TELEPHONE LINE WAS STILL OPEN. W-1 THEN GAVE THE TELEPHONE BACK TO THE COMPLAINANT.

ON APRIL 26, 2005, AT APPROXIMATELY 0700 HOURS, THE DEFENDANT RESPONDED TO FIRST DISTRICT POLICE STATION AND TURN HERSELF OVER TO POLICE CUSTODY. AN ARREST WARRANT WAS ISSUED FOR THE DEFENDANT BY JUDGE BEANDRIN FOR THREATS. THE WARRANT NUMBER IS US 427-05.

**61. DEFENDANT'S VERSION / REMARKS:**

| RECORD CLERK'S NAME | | 3. | 4. | 64. PROPERTY BOOK/PAGE NO. PRISONER'S PROPERTY ONLY |
|---|---|---|---|---|
| 63. ARREST RECORD 1. | 2. | 5. | 6. | |
| 65. BAIL REFORM ACT | | | | |

| 66. PRINTED NAME - OFFICER MAKING STATEMENT | BADGE NUMBER | RANK | 68. SIGNATURE OF REVIEWING OFFICER | |
|---|---|---|---|---|
| EGGLESTON, JUANITA L | D2-189 | DET | | |
| 67. SIGNATURE OF OFFICER MAKING STATEMENT | UNIT 1DDU | DATE 04/26/05 | UNIT MD-OSD | DATE 04/26/05 |

EXHIBIT 6

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CRIMINAL DIVISION

UNITED STATES OF AMERICA
**DISTRICT OF COLUMBIA**

**Intake Date:** _____ 4/26/05

v.

**#41**

RITA CHISHOLM

**Lock Up No.** _____

PDID NO. _____573——090_____

Criminal Case No. _____M——4107——05_____

## RELEASE ORDER ADDENDUM

You, the defendant in this case, are being released from custody pending further court appearances in your case. You **MUST** obey the following conditions, which are being imposed **IN ADDITION** to any other conditions that the Court may impose pursuant to D.C. Code Section 23-1321. You **MUST** abide by these conditions until this case is disposed of or until they are changed by the Court.

☒☒☒  **YOU ARE TO STAY AWAY FROM THE PERSON(S) LISTED BELOW:**  Names and addresses (if applicable) of victims/witnesses:

_____JENNIFER  GALLOWAY_____

**YOU, THE DEFENDANT, ARE TO HAVE NO CONTACT WITH ANY OF THE PERSONS NAMED ABOVE BY ANY MEANS WHATSOEVER. THIS MEANS THAT YOU SHALL REMAIN AT LEAST 100 YARDS AWAY FROM THEM, THEIR HOME, AND/OR THEIR PLACE OF EMPLOYMENT, AND THAT YOU SHALL NOT COMMUNICATE OR EVEN ATTEMPT TO COMMUNICATE WITH ANY OF THESE PERSONS NAMED ABOVE, EITHER DIRECTLY OR THROUGH ANY OTHER PERSON (EXCEPT THROUGH YOUR LAWYER), BY TELEPHONE, WRITTEN MESSAGE, ELECTRONIC MESSAGE, PAGER, OR OTHERWISE.**

☒☒☒☒  **YOU ARE TO STAY AWAY FROM THE FOLLOWING PLACE(S) OR AREA(S):**

_____3424   SUMMIT CT NE_____

☒☒☒  A check here means a map is attached          Area(s) Affected _____ bs    101

☐  **YOU MUST ALSO OBSERVE THE FOLLOWING CONDITION(S):**

*ANY VIOLATION OF ANY OF THESE CONDITIONS, OR ANY OTHER CONDITION IMPOSED BY THE COURT, MAY RESULT IN IMMEDIATE NOTIFICATION BEING MADE TO THE COURT AND COULD RESULT IN YOUR PROSECUTION FOR CONTEMPT OF COURT, THE REVOCATION OF YOUR RELEASE PURSUANT TO D.C. CODE SECTION 23-1329, AND/OR YOUR DETENTION PENDING FINAL DISPOSITION OF THIS CASE.*

DATE: _____4/26/05_____

**SO ORDERED:**

_Rita E. Chisholm_
Signature of Defendant

_Hugh O.A_
Signature of Judicial Officer

WHITE - COURT JACKET          BLUE - DEFENDANT          YELLOW - DEFENSE COUNSEL
GREEN - PRETRIAL SERVICES AGENCY          BUFF - MPD          PINK - U.S. ATTORNEY

000135

FORM CI-12
REV. MAR. 7, 2001

EXHIBIT H

## DEFENDANT'S ACCEPTANCE

I have read, or have had read to me, this First time Offender Diversion agreement and have discussed it with my attorney. I fully understand this agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me. I am not under the influence of anything that could interfere with my ability to understand this agreement fully.

I have no criminal convictions in Washington, D.C. or in any other jurisdiction (excluding traffic offenses).

I admit criminal responsibility in this case.

I understand that the Sixth Amendment to the United States Constitution gives me the right to a speedy trial. I hereby request a delay of the trial in the above-referenced case for the diversionary period because I wish to participate in the First Time Offender Diversion Program. For this period of time, I choose not to exercise my right to a speedy trial.

I affirm that absolutely no promises, agreements, understandings, or conditions have been made to me except those set forth in this agreement.

I am satisfied with the legal services provided by my attorney in connection with this diversion agreement and matters related to it.

Date: 7-5-05                      _Rita E. Cha____
                                  Defendant


## ATTORNEY'S ACKNOWLEDGMENT

I have read each of the pages constituting this agreement, reviewed them with my client, and discussed the provisions of the agreement with my client fully. These pages accurately and completely set forth the entire agreement.

Date: 7/5/05                      _Jerguen___
                                  Attorney for the Defendant

4

C00163

Exhibit I

| Case Number | Status | Judge |
|---|---|---|
| 2005 CMD 010837 | Closed | RIGSBY, ROBERT R |

| In The Matter Of | Action |
|---|---|
| GALLOWAY, JENNIFER | UCSA PWID MARIJUANA |

| Party | | Attorneys |
|---|---|---|
| GALLOWAY, JENNIFER | CDEF | TOWE, Mr REGINALD M |

| Opened | Disposed | Case Type |
|---|---|---|
| 10/12/2005 | Case Disposed - DWP | Misdemeanor |

Comments:

Charge:                                    Speed:        Zone:

Description:

Amnd Chrg:    U091

Description:  UCSA PWID MARIJUANA


Disposition: Grand Jury          Disposition Date:  11/09/2005
             Indictment Filed

Plea: Not Guilty                 Decision:

Sentence:
Amount:                Traffic Points:      Restrictions:

License Suspended Days:    Start Date:        End Date:

Jail Time:                 Start Date:        End Date:


Suspended:
Amount:

License Suspended Days:

Jail Time:

Probation:
Type:

Probation Officer:

Days on Probation:         Start Date:        End Date:

Comments:
Charge:                                    Speed:        Zone:

Description:

Amnd Chrg:    48DC904.01A1A2B-W

Description:  Poss W/I to Dist Marijuana-Misd


Disposition: DWP                 Disposition Date:  05/25/2006

2005 CMD 010837    GALLOWAY, JENNIFER
_____

Plea: Not Guilty                    Decision:

Sentence:
Amount:                    Traffic Points:        Restrictions:

License Suspended Days:     Start Date:             End Date:

Jail Time:                 Start Date:             End Date:


Suspended:
Amount:

License Suspended Days:

Jail Time:

Probation:
Type:

Probation Officer:

Days on Probation:         Start Date:             End Date:

Comments:
Charge:                                     Speed:        Zone:

Description:

Amnd Chrg:    48DC1103A-X

Description:  Poss Drug Paraphernalia W/I to Use



Disposition: DWP              Disposition Date:  05/25/2006

Plea: Not Guilty                    Decision:

Sentence:
Amount:                    Traffic Points:        Restrictions:

License Suspended Days:     Start Date:             End Date:

Jail Time:                 Start Date:             End Date:


Suspended:
Amount:

License Suspended Days:

Jail Time:

Probation:
Type:

Probation Officer:

Days on Probation:         Start Date:             End Date:

Comments:
_____

No.   Date of   Pleadings Filed, Orders and Decrees       Amount Owed/      Balance Due
                Journal Book-Page-Nbr     Ref Nbr         Amount Dismissed

2005 CMD 010837    GALLOWAY, JENNIFER

---

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr     Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|------------------------------------------------------------|---------|---------|
| 1 | 05/25/06 | Case Dismissed for Want of Prosecution<br>Charge #1: UCSA PWID MARIJUANA | 0.00 | 0.00 |
| 2 | 05/25/06 | Charge Disposed - DWP | 0.00 | 0.00 |
| 3 | 05/25/06 | Charge Disposed - DWP | 0.00 | 0.00 |
| 4 | 05/25/06 | Event Resulted - Release Status: Personal<br>Recognizance<br>The following event: Jury Trial scheduled<br>for 05/25/2006 at 10:00 am has been<br>resulted as follows:<br><br>Result: Dismissed for Want of Prosecution<br><br>Government agreed to Dismissed for Want of<br>Prosecution.<br>Judge: RIGSBY, ROBERT R     Location:<br>Courtroom 316<br>JENNIFER GALLOWAY (Defendant (Criminal));<br>; Mr REGINALD M TOWE (Attorney) on behalf<br>of JENNIFER GALLOWAY (Defendant<br>(Criminal)); Judge ROBERT R RIGSBY | 0.00 | 0.00 |
| 5 | 03/02/06 | Event Resulted<br>The following event: Status Hearing<br>scheduled for 03/02/2006 at 9:00 am has<br>been resulted as follows:<br><br>Result: Held<br>Trial date set    Co-Def w/ Frankin<br>Johnson 2005 Fel 5858<br>JENNIFER GALLOWAY (Defendant (Criminal));<br>; Mr REGINALD M TOWE (Attorney) on behalf<br>of JENNIFER GALLOWAY (Defendant (Criminal)) | 0.00 | 0.00 |
| 6 | 03/02/06 | Event Scheduled<br>Event: Jury Trial<br>Date: 05/25/2006    Time: 10:00 am<br>Judge: RIGSBY, ROBERT R     Location:<br>Courtroom 316<br><br>Result: Dismissed for Want of Prosecution | 0.00 | 0.00 |
| 7 | 03/02/06 | Form Generated:<br><br>Notice to Return to Court<br>Sent on:  03/02/2006  09:59:16 | 0.00 | 0.00 |
| 8 | 02/27/06 | Pre Trial Report/STATUS REPORT | 0.00 | 0.00 |

2005 CMD 010837   GALLOWAY, JENNIFER

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr      Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|---|---|---|
| 9 | 02/21/06 | Event Resulted<br>The following event: Status Hearing<br>scheduled for 02/21/2006 at 11:30 am has<br>been resulted as follows:<br><br>Result: Held<br><br>Defense requested continuance of status<br>hearing.<br>JENNIFER GALLOWAY (Defendant (Criminal));<br>; Mr REGINALD M TOWE (Attorney) on behalf<br>of JENNIFER GALLOWAY (Defendant (Criminal)) | 0.00 | 0.00 |
| 10 | 02/21/06 | Event Scheduled<br>Event: Status Hearing<br>Date: 03/02/2006    Time: 9:00 am<br>Judge: RIGSBY, ROBERT R    Location:<br>Courtroom 316<br><br>Result: Held | 0.00 | 0.00 |
| 11 | 02/21/06 | Form Generated:<br><br>Notice to Return to Court<br>Sent on: 02/21/2006  10:50:50 | 0.00 | 0.00 |
| 12 | 02/07/06 | Form Filed:  PSA conditions of release<br>filed. | 0.00 | 0.00 |
| 13 | 02/07/06 | Government Continuance<br>The following event: Jury Trial scheduled<br>for 02/07/2006 at 9:00 am has been<br>resulted as follows:<br><br>Result: Government Continuance<br><br>Government counsel in trial before Court.<br>JENNIFER GALLOWAY (Defendant (Criminal));<br>; Mr REGINALD M TOWE (Attorney) on behalf<br>of JENNIFER GALLOWAY (Defendant (Criminal)) | 0.00 | 0.00 |
| 14 | 02/07/06 | Event Scheduled<br>Event: Status Hearing<br>Date: 02/21/2006    Time: 11:30 am<br>Judge: RIGSBY, ROBERT R    Location:<br>Courtroom 316<br><br>Result: Held | 0.00 | 0.00 |
| 15 | 02/07/06 | Form Generated:<br><br>Notice to Return to Court<br>Sent on: 02/07/2006  09:45:26 | 0.00 | 0.00 |

2005 CMD 010837   GALLOWAY, JENNIFER

---

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr      Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|----------------------------------------------------------------------|-------------------------------|-------------|
| 16 | 12/09/05 | JUDGE: RIGSBY              , ROBERT | 0.00 | 0.00 |
|    |          | DEFENSE ATTY: TOWE                 , | | |
|    |          | REGINALD M | | |
|    |          | CONTINUED:   2    3 | | |
|    |          | CONT. DATE: 02-07-2006 | | |
|    |          | FOR: JURYTRIAL | | |
|    |          | BOND STATUS: PERSONAL RECOGNIZANCE | | |
|    |          | BOND CASH PCT: | | |
|    |          | BOND ACTION CODE: | | |
| 17 | 11/16/05 | JUDGE: RIGSBY              , ROBERT | 0.00 | 0.00 |
|    |          | DEFENSE ATTY: TOWE                 , | | |
|    |          | REGINALD M | | |
|    |          | CONTINUED:   2    3 | | |
|    |          | CONT. DATE: 12-09-2005 | | |
|    |          | FOR: STATUS HEARING | | |
|    |          | BOND STATUS: PERSONAL RECOGNIZANCE | | |
|    |          | BOND CASH PCT: | | |
|    |          | BOND ACTION CODE: | | |
| 18 | 11/09/05 | JUDGE: RIGSBY              , ROBERT | 0.00 | 0.00 |
|    |          | DEFENSE ATTY: TOWE                 , | | |
|    |          | REGINALD M | | |
|    |          | CONTINUED:   2    3 | | |
|    |          | CONT. DATE: 11-16-2005 | | |
|    |          | FOR: ARRAIGNMENT | | |
|    |          | GRAND JURY:   1 | | |
|    |          | BOND STATUS: PERSONAL RECOGNIZANCE | | |
|    |          | BOND CASH PCT: | | |
|    |          | BOND ACTION CODE: | | |
| 19 | 10/14/05 | JUDGE: RIGSBY              , ROBERT | 0.00 | 0.00 |
|    |          | DEFENSE ATTY: TOWE                 , | | |
|    |          | REGINALD M | | |
|    |          | DISPOSED:    1 | | |
|    |          | BOND STATUS: PERSONAL RECOGNIZANCE | | |
|    |          | BOND CASH PCT: | | |
|    |          | BOND ACTION CODE: | | |
| 20 | 10/12/05 | JUDGE: SULLIVAN            , FREDERICK | 0.00 | 0.00 |
|    |          | DEFENSE ATTY: TOWE                 , | | |
|    |          | REGINALD M | | |
|    |          | CONTINUED:    1 | | |
|    |          | CONT. DATE: 10-14-2005 | | |
|    |          | FOR: STATUS HEARING | | |
|    |          | BOND STATUS: PERSONAL RECOGNIZANCE | | |
|    |          | BOND CASH PCT: | | |
|    |          | BOND ACTION CODE: | | |

---

Totals By:  Information          0.00          0.00
*** End of Report ***

EXHIBIT 5

LexisNexis® *Total Research System*

Switch Client ┊ Preferences ┊ Sign Off ┊ ? Help

Search ┊ Research Tasks ┊ Get a Document ┊ Shepard's® ┊ Alerts ┊ Transactional Advisor ┊ Counsel Selector ┊ H

Source: Legal > / . . . / > **District of Columbia Circuit - US District Court Cases** [i]
Terms: **name(holloman and chertoff)** (Edit Search | Suggest Terms for My Search)

2008 U.S. Dist. LEXIS 9574, *

CHRISTOPHER **HOLLOMAN,** Plaintiff, v. MICHAEL **CHERTOFF,** Secretary for Department of Homeland Security, Defendant.

Civil Action No. 04-1071 (RBW)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

2008 U.S. Dist. LEXIS 9574

February 11, 2008.

## CASE SUMMARY

**PROCEDURAL POSTURE:** In plaintiff former employee's employment discrimination suit seeking compensatory damages and injunctive relief, defendant federal employer filed a motion for summary judgment. The employee alleged that the Federal Air Marshal Service (FAMS) had discriminated against him on the basis of race and national origin under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. §§ 2000e--2000e-17. The employee filed a cross-motion for summary judgment.

**OVERVIEW:** While a probationary trainee for a job as a federal air marshal, the African American employee was cited for violating New Mexico's open container law, N.M. Stat. Ann. § 66-8-138(B). FAMS investigated and terminated the employee after finding that he had been abusive and uncooperative with the officer who issued the citation. The employee argued that he was treated disparately from white trainees who engaged in misconduct during their probationary periods. The court held that as a matter of law the employee failed to show that an inference of discrimination arose under Title VII because, contrary to his assertions, the record showed that he admitted to having an open container of alcohol in a car. The affidavits from other occupants of the car confirmed his admission as well as his abusive behavior to the citing officer. Therefore, the employee failed to show that FAMS's reason for terminating him was pretextual. Additionally, the white trainees named by the employee were not deemed to be similarly situated because the employee was not terminated because of the open container infraction but because he failed to demonstrate the good judgment required for an air marshal's job.

**OUTCOME:** The court granted the employer's motion for summary judgment and denied the employee's cross-motion for summary judgment.

**CORE TERMS:** trainee, training, summary judgment, beer, police officer, bottle, termination, terminated, law enforcement officer, citation omitted, prima facie case, quotation, open container, similarly situated, deposition, laintiff, material facts, recommended, supplemental report, passenger, disciplined, color, floor, cross-motion, terminate, cooperate, front, seat, guy, disorderly conduct

## LEXISNEXIS® HEADNOTES                                     ⊟ **Hide**

Civil Procedure > Summary Judgment > Standards > Appropriateness 🔳

**HN1** ⬇ Under Fed. R. Civ. P. 56, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Absence of Essential Element of Claim 🔳
Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants 🔳
Civil Procedure > Summary Judgment > Evidence 🔳

**HN2** ⬇ When ruling on a Fed. R. Civ. P. 56 motion, a court must view the evidence in the light most favorable to the non-moving party. The court must also draw all justifiable inferences in the non-moving party's favor and accept the non-moving party's evidence as true. The non-moving party, however, cannot rely on mere allegations or denials, for conclusory allegations unsupported by factual data will not create a triable issue of fact. If the court concludes that the non-moving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then the moving party is entitled to summary judgment.  More Like This Headnote

Evidence > Procedural Considerations > Burdens of Proof > Burden Shifting 🔳
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > General Overview 🔳

**HN3** ⬇ Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. §§ 2000e--2000e-17, provides that all personnel actions affecting employees in executive agencies shall be made free from any discrimination based on race, color, religion, sex, or national origin. 42 U.S.C.S. § 2000e-16(a). Where there is no direct evidence of discrimination on one of these impermissible categories, a court assesses a plaintiff's claim under the framework set forth by the U.S. Supreme Court in McDonnell Douglas Corp. v. Green. Under the McDonnell Douglas framework, the plaintiff must establish a prima facie case of discrimination in the first instance, after which the burden shifts to the defendant, who must articulate some legitimate, nondiscriminatory reason for the adverse action. Assuming that the defendant can satisfy that burden, the McDonnell Douglas framework--with its presumptions and burdens--disappears, and the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.  More Like This Headnote

Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > General Overview 🔳

**HN4** ⬇ To establish a prima facie case of unlawful discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. §§ 2000e--2000e-17, a plaintiff must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.  More Like This Headnote

Civil Procedure > Pleading & Practice > Motion Practice > Opposing Memoranda 🔳

**HN5** ⬇ It is understood in the U.S. District Court for the District of Columbia Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded. The court's authority to treat

unopposed arguments as conceded derives from D.D.C. Civ. R. 7 (b). More Like This Headnote

Civil Procedure > Pleading & Practice > Motion Practice > Opposing Memoranda 🗐
HN6⬦ See D.D.C. Civ. R. 7(b).

Civil Procedure > Pleading & Practice > Motion Practice > Opposing Memoranda 🗐
HN7⬦ Courts have interpreted D.D.C. Civ. R. 7(b) to apply to specific arguments within a memorandum opposing a motion. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > Adverse Employment Actions > Discipline 🗐
HN8⬦ Under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. §§ 2000e--2000e-17, in evaluating whether a plaintiff and his or her relevant coworkers are similarly situated, the nature of the offenses committed and the punishments imposed are the most significant variables in a case alleging discrimination in connection with disciplinary actions. More Like This Headnote

Criminal Law & Procedure > Criminal Offenses > Vehicular Crimes > Driving Under the Influence > Elements 🗐
HN9⬦ N.M. Stat. Ann. § 66-8-138(B) prohibits the knowing possession, while in a motor vehicle upon any public highway within the state, any bottle containing any alcoholic beverage that has been opened. More Like This Headnote

Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > General Overview 🗐
HN10⬦ Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. §§ 2000e--2000e-17, does not authorize a federal court to become a super-personnel department that reexamines an entity's business decisions, and the court may not second-guess an employer's personnel decision absent demonstrably discriminatory motive. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Coverage & Definitions 🗐
HN11⬦ The central focus of the inquiry in an disparate treatment employment discrimination case is always whether an employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin. More Like This Headnote

**COUNSEL:** [*1] For CHRISTOPHER S. HOLLOMAN, Plaintiff: Richard Lloyd Thompson, II, LEAD ATTORNEY, LAW FIRM OF NATHANIEL D. JOHNSON, LLC, Waldorf, MD.

For THOMAS J. RIDGE, Secretary, U.S. Department of Homeland Security, Transportation Security Administration, Defendant: Benton Gregory Peterson, ASSISTANT UNITED STATES ATTORNEY, Washington, DC; Peter Blumberg ⬇, FEDERAL EXPRESS, Legal Department, Memphis, TN.

**JUDGES:** REGGIE B. WALTON, United States District Judge.

**OPINION BY:** REGGIE B. WALTON

**OPINION**

## MEMORANDUM OPINION

Christopher Holloman, the plaintiff in this civil lawsuit, seeks compensatory damages "in excess of" $ 300,000 and injunctive relief against Michael Chertoff, the Secretary for the Department of Homeland Security, in his capacity as Secretary for the Cabinet department overseeing the Transportation Security Administration and, through that agency, the Federal Air Marshal Service (the "FAMS"), [1] for alleged unlawful discrimination against the plaintiff on the basis of race and national origin pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 (2000). Complaint (the "Compl.") P P 1, (i)-(iii). Currently before the Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. [*2] After carefully reviewing the pleadings filed in this case, the parties' motions, and all memoranda and exhibits relating thereto, [2] the Court concludes that it must grant the defendant's motion for summary judgment and deny the plaintiff's cross-motion for the reasons that follow.

### FOOTNOTES

[1] The plaintiff's complaint, filed June 28, 2004, names Thomas J. Ridge, at that time the Secretary for the Department of Homeland Security, as the defendant in this civil case. The Court has substituted Secretary Chertoff as the defendant in lieu of former Secretary Ridge pursuant to Federal Rule of Civil Procedure 25(d)(1).

[2] In addition to the plaintiff's complaint, the defendant's answer, the defendant's motion for summary judgment and the plaintiff's cross-motion for summary judgment, the Court considered the following documents in reaching its decision: (1) the Defendant's Memorandum of Law in Support of Motion for Summary Judgment (the "Def.'s Mem."), (2) the defendant's Statement of Undisputed Material Facts (the "Def.'s Facts"), (3) the Plaintiff's Opposition to Defendant's Motion for Summary Judgment (the "Pl.'s Opp'n"), (4) the Plaintiff's Response to Defendant's Statement of Material Facts, (5) the [*3] Memorandum in Support of Plaintiff's Motion for Summary Judgment (the "Pl.'s Mem."), (6) the Plaintiff's Statement of Material Issues of Fact (the "Pl.'s Facts"), (7) the Memorandum in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Response to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (the "Def.'s Opp'n"), (8) the Defendant's Response to Plaintiff's Statement of Material Facts Not in Dispute, (9) the Plaintiff's Errata Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment (the "Pl.'s Reply") and (10) the Plaintiff's Errata Adding Exhibit to Motion.

## I. Background

The following facts are either admitted or not in dispute. [3] The plaintiff, an African-American who "resides in the State of Maryland," Compl. P P 3-4, "was hired as a Federal Air Marshall [('FAM')] Officer on June 23, 2002." Pl.'s Facts P 1. His "employment was conditioned upon successful completion" of a training program held at the Federal Law Enforcement Training Center (the "FLETC"), id., in Artesia, New Mexico. Compl. P 11; Def.'s Facts P 2.

### FOOTNOTES

[3] Unless otherwise noted, all allegations from the complaint cited herein are admitted in the defendant's [*4] answer, and all statements from the parties' statements of material facts cited herein are undisputed.

"During the evening of July 26, 2002, and the early morning hours of July 27, 2002," Def.'s Facts P 2, the plaintiff, along with fellow FAM trainees Albert Hill (also an African-American), William Felde, and Patrick Hickey (both Caucasian), "stopped at a convenience store[] off the FLETC premises[] to purchase something to eat," Compl. P 12. "As the trainees entered the convenience store, two white local police officers approached Albert Hill, the designated driver," Pl.'s Facts P 3, and "demanded to search the vehicle [in which the p]laintiff and his companions were traveling[,]" Compl. P 14. "Upon search[ing] the vehicle, the officer found a beer bottle in the rear passenger floor board[,] . . . a cooler [(]also in the rear[)] with an unopened bottle of beer and a half bottle of Bacardi," Pl.'s Facts P 4, and "an open bottle of beer on the floor near the front passenger seat," id. P 5.

The officer asked the plaintiff whether "the open bottle of beer on the floor near the front passenger seat . . . belonged to him." Id. P 5. When the plaintiff "denied that he drank from the beer bottle  [*5] while on the parking lot of [the convenience store], but admitted that he drank from the bottle earlier," the officer "issued a citation for an [o]pen [c]ontainer infraction." Id. P 6. [4] In contrast, "[t]he officer asked Patrick Hickey [[one of the] white trainee[s]) to discard the empty bottle [that the officer] found near [Hickey] in the rear of the vehicle" without issuing a citation to Hickey. Id. P 4. Of the four trainees, the plaintiff was the "only person" who received a citation. Id. P 6. [5]

---

**FOOTNOTES**

[4] Pursuant to § 66-8-138 of the New Mexico Code, "[n]o person shall knowingly have in his possession on his person, while in a motor vehicle upon any public highway within this state, any bottle, can or other receptacle containing any alcoholic beverage that has been opened or had its seal broken or the contents of which have been partially removed." N.M. Stat. § 66-8-138(B).

[5] Although this fact was neither alleged nor stipulated to by the parties, there is undisputed evidence in the record that the plaintiff was also cited for disorderly conduct. See Def.'s Mem., Ex. B (State of New Mexico Uniform Incident Report) at 1 (reflecting the plaintiff's citation for both an open container violation  [*6] and "disorderly conduct" in violation of N.M. Stat. § 30-20-1).

---

The officer who issued the plaintiff a citation also prepared a "supplemental report" that he appended to the citation. Def.'s Mem., Ex. C (State of New Mexico Supplemental Report) (the "Supplemental Report"). In that report, the officer states that the plaintiff became "very irate and verbally abusive" when approached by the officer, and had to be "physically subdue[d]" by his fellow trainees "as he became out of control." Id. at 1. The police officer further states that the plaintiff later said "that he was from 'D.C.' and didn't care about any open container citation." Id. The police officer states that at that point he "cited [the plaintiff] into the [m] agistrate court in Artesia." Id.

The FAMS "launched an investigation of the incident" the very next day. Pl.'s Facts P 7. As part of this investigation, "[the p]laintiff and the other FAM trainees[] were asked to write affidavit statements." Id. The trainees neither corroborated nor contradicted the specific factual allegations made in the Supplemental Report in their statements; however, two of the trainees noted the plaintiff's uncooperative behavior in dealing with  [*7] the local police. See Def.'s Mem., Ex. J (Untitled Statement of Patrick Hickey) (the "Hickey Statement") at 2 ("The [o]fficer gave [the plaintiff] every opportunity possible to tell the truth and put this in the past[,] but [the plaintiff] would not comply and tell the truth."); id. at Ex. L (Memorandum to FAM Oversight Training Committee from William Felde) (the "Felde Memo") at 2 (describing the plaintiff as being "[t]he only person in our group that gave the officer

any attitude"). In an interview with Timothy Davis, the "Team Leader on the Training Oversight Committee [(the 'Training Committee')] at [the] FLETC," Pl.'s Facts P 2, the plaintiff "complained that he thought that the Eddy County Police Officers harassed him solely because of his race," *id.* P 7. Nevertheless, Davis "recommended [the p]laintiff's dismissal." *Id.*

On July 31, 2002, "[the p]laintiff was removed from the training program based upon the incident that occurred at the convenience store on July 27, 2002." Compl. P 17. "Via letter dated August 23, 2002," the FAMS terminated the plaintiff from his probationary position, citing "his behavior during the incident that led to his [citation]," which "caused the FAMS **[*8]** to lose confidence in his ability to perform as a [FAM]." Def.'s Facts P 4. Specifically, the FAMS cited the plaintiff's "[lack of] judgment and uncooperative attitudes towards a local law enforcement officer" as the basis for the plaintiff's termination. *Id.* "The termination letter stated that the other trainee[s'] witnesses' declarations corroborated the incident as alleged by the police officer." Pl.'s Facts P 9.

The plaintiff appealed his termination to the Merit Systems Protection Board on September 20, 2002. Def.'s Facts P 5. That appeal was dismissed "for lack of jurisdiction," *id.* P 6, prompting the plaintiff to "file[] a formal complaint of discrimination" with the Equal Employment Opportunity Commission in which he "alleged race and color discrimination because he was removed from employment," *id.* P 7. The plaintiff filed his complaint in this Court on June 28, 2004.

After a protracted discovery period and failed attempt at mediation, the defendant filed his motion for summary judgment on July 6, 2007. The plaintiff filed an opposition to that motion on September 10, 2007, and a separate cross-motion for summary judgment on September 12, 2007. Briefing on the parties' cross-motions **[*9]** closed on October 23, 2007.

The defendant asserts that summary judgment in his favor is appropriate for two reasons. First, the defendant argues that "[the p]laintiff cannot establish a prima facie case of race discrimination because the circumstances under which he was terminated do not give rise to an inference of discrimination." Def.'s Mem. at 9. Second, the defendant contends that the plaintiff cannot sustain his "ultimate burden of persuasion that [the d]efendant discriminated against him because of his race or color" because the defendant's "concern regarding [the p] laintiff's suitability to perform in a highly sensitive law enforcement position requiring good judgment in an extremely successful environment" is a "legitimate[,] non-discriminatory reason[]" for terminating the plaintiff's employment that "cannot be considered pretextual." *Id.* at 11.

The plaintiff contests both of these points. He argues that an inference of discrimination arises where a plaintiff "did not engage in the conduct for which he was disciplined," Pl.'s Mem. at 9, or where "employees not of [the plaintiff's] protected group who[] engage in comparable acts [are] not punished," Pl.'s Opp'n at 9, and that **[*10]** the plaintiff satisfies both of these conditions, *see id.* (arguing that the plaintiff "did not engage in the conduct for which he was issued [the] citation" that led to his termination); *see also id.* (arguing that a reasonable jury could infer discrimination because similarly situated co-workers of the plaintiff were not terminated despite their misconduct); Pl.'s Mem. at 12 (same). The plaintiff further argues that the defendant's proffered reason for terminating his employment was pretextual because a white trainee "was recommended for termination due to his poor judgment," but, unlike the plaintiff, "was permitted to graduate," Pl.'s Mem. at 11; *see also* Pl.'s Opp'n at 14 ("Notwithstanding the white trainee's uncooperativeness and disrespect towards FLETC instructors and other trainees throughout the duration of the program, upper management refused to terminate the white trainee and he was permitted to graduate."), and because there is evidence in the record suggesting that the Training Committee was determined to eliminate the plaintiff from the FAMS program because of his race, *see* Pl.'s

Reply at 12-14 (pointing to various items in the record that purportedly suggest racial bias **[*11]** on the part of the Training Committee).

## II. Standard of Review

The parties seek summary judgment pursuant to <u>Federal Rule of Civil Procedure 56</u>. **HN1** Under that rule, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Fed. R. Civ. P. 56</u>. **HN2** When ruling on a <u>Rule 56</u> motion, the Court must view the evidence in the light most favorable to the non-moving party. <u>Holcomb v. Powell</u>, 369 U.S. App. D.C. 122, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). The Court must also draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true. <u>Anderson v. Liberty Lobby, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)</u>. The non-moving party, however, cannot rely on "mere allegations or denials," <u>Burke v. Gould, 351 U.S. App. D.C. 1, 286 F.3d 513, 517 (D.C. Cir. 2002)</u> (quoting <u>Anderson</u>, 477 U.S. at 248) (internal quotation and citation omitted), for "conclusory allegations unsupported by factual data will not create a triable issue of **[*12]** fact." <u>Pub. Citizen Health Research Group v. FDA</u>, 337 U.S. App. D.C. 343, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal quotation and citation omitted). If the Court concludes that "the non-moving party has failed to make a sufficient showing on an essential element of h[is] case with respect to which []he has the burden of proof," then the moving party is entitled to summary judgment. <u>Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)</u>.

## III. Legal Analysis

**HN3** Title VII provides that "[a]ll personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." <u>42 U.S.C. § 2000e-16(a)</u>. Where, as here, there is no direct evidence of discrimination on one of these impermissible categories, the Court assesses the plaintiff's claim under the framework set forth by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under the <u>McDonnell Douglas</u> framework, "the plaintiff must establish a prima facie case of discrimination" in the first instance, <u>Reeves</u>, 530 U.S. at 142, after which "the burden shifts to the defendant, who must 'articulate some legitimate, non-discriminatory reason' for the **[*13]** adverse action.'" <u>Czekalski v. Peters</u>, 374 U.S. App. D.C. 351, 475 F.3d 360, 363 (D.C. Cir. 2007) (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802). Assuming that the defendant can satisfy that burden, "the <u>McDonnell Douglas</u> framework--with its presumptions and burdens--disappear[s]," <u>Reeves</u>, 530 U.S. at 142-43 (internal quotation and citation omitted), and "the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." <u>Lathram v. Snow</u>, 357 U.S. App. D.C. 413, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

**HN4** To establish a prima facie case of unlawful discrimination, a plaintiff must show that "(1) []he is a member of a protected class; (2) []he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." <u>George v. Leavitt, 366 U.S. App. D.C. 11, 407 F.3d 405, 412 (D.C. Cir. 2005)</u> (internal quotation and citation omitted). The defendant concedes that the plaintiff "is a member of a class protected by Title VII based on his race," Def.'s Mem. at 9, and does not dispute the self-evident point that the plaintiff's termination was an "adverse employment action." [6] Instead, he argues that "[the p]laintiff has failed to **[*14]** raise an inference of possible race[-] or color[-]based discrimination" because he "cannot identify any similarly situated employees of a different race or color who were treated more favorably than he when confronted with an incident

which led to a field citation arrest." *Id.* at 10. The plaintiff counters that he "is not required to identify similarly-situated individuals outside of his protected classification in order to establish prima facie discharge discrimination" if "'he did not engage in the conduct for which he was disciplined,'" Pl.'s Opp'n at 8 (quoting *Plummer v. Bolger*, 559 F. Supp. 324, 329 (D.D.C. 1983)), and that in any event other similarly situated Caucasian FAM trainees were not terminated despite engaging in the same conduct as the plaintiff, *see id.* at 12-14 (describing alleged unpunished misconduct by various Caucasian FAM trainees).

---

**FOOTNOTES**

6 *HN5* "It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Buggs v. Powell*, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) (Walton, J.). The Court's authority **[\*15]** to treat unopposed arguments as conceded derives from Local Civ. R. 7(b), which states as follows:

> *HN6* Within 11 days of the date of service or at such other time as the court may direct, an opposing party shall serve and file a memorandum of points and authorities in opposition to the motion. *If such a memorandum is not filed within the prescribed time, the court may treat the motion as conceded.*

(Emphasis added.) *HN7* "Courts have interpreted this local rule to apply to specific arguments within a memorandum opposing a motion." *United States v. Real Property*, 287 F. Supp. 2d 45, 61 (D.D.C. 2003) (Walton, J.). The District of Columbia Circuit "'ha[s] yet to find that a district court's enforcement of this rule constituted an abuse of discretion.'" *Buggs*, 293 F. Supp. 2d at 141 (quoting *FDIC v. Bender*, 326 U.S. App. D.C. 390, 127 F.3d 58, 67-68 (D.C. Cir. 1997) (internal citations omitted)). The Court therefore declines "to act as an advocate for [] [the parties] and construct their legal arguments on [their] behalf in order to counter those in the motion to dismiss." *Real Property*, 287 F. Supp. 2d at 61 (internal quotation and citation omitted).

---

The plaintiff has the better of this argument in one respect. "Although **[\*16]** one method by which a plaintiff can satisfy the third prong of the prima facie test is by demonstrating that [] he was treated differently from similarly situated employees who are not part of the protected class, this is not the only way." *Czekalski*, 475 F.3d at 365-66 (internal quotation and citation omitted). Rather, a plaintiff in a discharge case can also satisfy the third prong of the prima facie requirement by "show[ing] that the discharge was not attributable to the two most common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether." *Id.* at 366 (internal quotation and citation omitted). The Court has therefore endeavored to determine whether there is any genuine dispute of material fact with respect to either of these scenarios, and, having made such a determination, concludes for the reasons that follow that neither scenario is present in this case and that as a consequence the plaintiff cannot establish a prima facie case of discrimination.

A. *Similarly Situated Employees*

*HN8* "In evaluating whether the plaintiff and the relevant co-worker[s] [we]re similarly situated, the nature of **[\*17]** the offenses committed and the punishments imposed are the most significant variables in a case alleging discrimination in connection with disciplinary

actions." *Santa Cruz v. Snow*, 402 F. Supp. 2d 113, 125-26 (D.D.C. 2005) (internal quotation and citation omitted). The plaintiff asserts that he "can prove an inference of discrimination by showing that Patrick Hickey and William Felde were found to be physically proximate to the same evidence of a violation (open alcohol containers)" as the plaintiff, but were not "cited by the police officers []or . . . disciplined by [the d]efendant." Pl.'s Opp'n at 9. He also claims that "another similarly[] situated white trainee who was recommended for termination from the program because of his seeming[] lack of judgment" was not terminated by "upper management" despite "the white trainee's uncooperativeness and disrespect towards FLETC instructors and other trainees throughout the duration of the program." *Id.* at 13-14. The Court finds neither of these assertions persuasive.

The plaintiff's assertion regarding Hickey and Felde is irrelevant because, as Timothy Davis, the leader of the Training Committee's investigation into the incident who recommended **[*18]** the plaintiff's termination, testified at his deposition, it was not the citation for possession of an open container of an alcoholic beverage that led to the plaintiff's dismissal. Davis Dep. 89:17-19 (Feb. 23, 2007) ("Q. Was Mr. Holloman also recommended to be dropped from the program because of an open container? A. No, sir, that was not the reason."). Rather, it was the plaintiff's belligerence and obduracy during his encounter with the local law enforcement officers that caused Davis to recommend his termination from the FAM program. *See id.* at 58:17-23 (explaining that Davis recommended that the plaintiff be terminated "[b]ased on . . . his lack of judgment" because, whereas the "other trainees that were in the vehicle with [the plaintiff] . . . all resolved the incident with the police officer in a satisfactory manner, [the plaintiff] did not"). Adam Kistler, the manager of the training division at FAMS who decided to terminate the plaintiff's employment, followed Davis's recommendation for that same reason. *See* Kistler Aff. P 7 (citing the plaintiff's "lapse in judgment in failing to cooperate with, and adopting an antagonistic toward, local law enforcement" as the reason why **[*19]** Kistler "los[t] confidence" in the plaintiff's ability to meet the requirements of the FAM position).

Nothing in the record remotely suggests that any of the other FAM trainees who were with the plaintiff on the night when he received his citation engaged in the bellicose manner exhibited by the plaintiff. The police officer who issued a citation to the plaintiff stated in his police report that the plaintiff "became very irate and verbally abusive" when he was approached by the officer, "using obscenities" and "bec[oming] more and more agitated" as the plaintiff's encounter with the officer progressed, whereas the other trainees stated that "they did not want any trouble." Supplemental Report at 1. According to Hickey, the officer stated that the other trainees "had done nothing wrong" and "appreciated the honesty and cooperation that [the other trainees] gave him." Hickey Statement at 2; *see also* Supplemental Report at 1 (stating that the police officer who issued a citation to the plaintiff "thanked [Hickey] for his honesty"). Felde stated that "[t]he only person in our group that gave the officer any attitude was [the plaintiff]," and that, "if not for the actions of one individual **[*20]** [(*i.e.*, the plaintiff), the trainees] would have been back at [the] FLETC and in bed by 1 [a.m.] ready for the next training day." Felde Memo at 2.

Of all the witnesses to the plaintiff's encounter with the police, only Albert Hill failed to mention the plaintiff's obstinate behavior. *See* Def.'s Mem., Ex. K (Untitled Statement of Albert Hill) (the "Hill Statement") at 1-2 (noting only that the officer at the scene issued a citation to the plaintiff for the beer located by the front passenger seat). But Hill did not contradict the other witnesses, either. Instead, he reported only that when the police officer asked the plaintiff for consent to search the trainees' car, the plaintiff stated that he "didn't agree with it, but gave consent anyway." *Id.* at 2. The plaintiff's own statement is also silent on this point. Pl.'s Opp'n, Ex. 3 (Untitled Statement by Christopher Holloman) at 1 (stating only that all of the trainees gave the officer consent to search their car after talking about the matter).

In light of the unrebutted evidence in the record establishing that the plaintiff was the only

person who refused to cooperate with local law enforcement, there is no genuine issue of disputed **[*21]** material fact as to whether the other FAM trainees present at the scene of the plaintiff's citation were similarly situated to the plaintiff. There is simply no question that, as a factual matter, the other FAM trainees did not engage in the same "offense[]" as that committed by the plaintiff. <u>Snow</u>, 402 F. Supp. 2d at 125. Accordingly, a reasonable jury could not infer racial discrimination from the fact that these other trainees were not subjected to the same "punishment[]." <u>Id.</u>

The plaintiff's argument that some other, unnamed trainee at the FLETC was similarly situated to the plaintiff because he also displayed a "lack of judgment," Pl.'s Opp'n at 13, is even less plausible. The argument rests entirely on certain deposition testimony from Davis in which he described an unnamed trainee who, *inter alia*, showed up late at the airport, Davis Dep. 47:17-22 (Feb. 23, 2007), threw his shaved-off hair on the yard at the FLETC training facility after he was instructed to cut his hair, *id.* at 47:24-48:10, and "had constant problems with . . . every other student in his particular class, all [of] the mentors, [and] all of the instructors," *id.* at 48:11-14. Although this trainee was "a pretty **[*22]** good performer" who "was actually number one in his class on academics," *id.* at 48:15-16, Davis "recommended that he be dropped from training based on the totality of the circumstances with him," *id.* at 48:21-23. "However, [Davis] was overruled by training management in Atlantic City." <u>Id.</u> at 48:24-25.

As is readily apparent from the Court's recitation of Davis's deposition testimony, there is nothing remotely similar about the circumstances surrounding the recommendations for termination of the plaintiff and this unnamed trainee. The plaintiff was cited for a violation of New Mexico's open container law and disorderly conduct after he refused to cooperate with local law enforcement. Incident Report at 1. The unnamed trainee "g[ot] into verbal arguments with his other classmates," was "disrespectful to the instructors," and "would . . . show up late to particular assignments." Davis Dep. 49:7-11 (Feb. 23, 2007). Setting aside any questions as to the wisdom of the Training Committee's decision to retain the unnamed trainee, there is no equivalency between engaging in rude behavior towards fellow trainees and instructors and refusing to cooperate with local law enforcement to such an **[*23]** extent that a citation is issued. Consequently, a reasonable jury could not infer racial discrimination from comparing the two situations based on the different treatment afforded the two trainees.

B. *Reason for Discharge*

As the Court explained above, the FAMS terminated the plaintiff's employment because Kistler "los[t] confidence in [the plaintiff's] ability to perform as a Federal Air Marshal" after the plaintiff's encounter with local law enforcement. Def.'s Mem., Ex. A (Letter from Adam Kistler, Manager, Federal Air Marshal Program Training to Christopher Holloman (Aug. 23, 2002)) (the "Kistler Letter") at 1. According to Kistler, both the officer who issued a citation to the plaintiff and the plaintiff's colleagues on the scene "reported that [the plaintiff] w[as] uncooperative" and was "very irate and verbally abusive" to the officer. *Id.* Because the plaintiff, "[a]s a law enforcement officer, . . . had a duty to cooperate with the police officer," and "did not do [so] to [Kistler's] satisfaction," Kistler "determined that it w[ould] promote the efficiency of the [FAMS] to terminate [the plaintiff's] employment as a FAM." *Id.* at 2.

Kistler's explanation for the plaintiff's termination **[*24]** clearly reflects his judgment that the plaintiff "perform[ed] below [the FAM's] legitimate expectations," one of the two "most common legitimate reasons for discharge." <u>Czekalski</u>, 475 F.3d at 366. Indeed, Kistler explained in an affidavit prepared in connection with this case that the FAM "position requires good judgment and frequent communication and cooperation with local law enforcement officials." Kistler Aff. P 7. The plaintiff's "lapse in judgment in failing to cooperate with, and adopting an antagonistic attitude toward, local law enforcement" caused Kistler to "lose confidence" in the plaintiff's ability to meet those requirements. *Id.*

The plaintiff argues at length "that he did not engage in the conduct for which he was issued a citation[] and, subsequently[,] terminated." Pl.'s Opp'n at 9. But that argument is beside the point. While the adverse treatment of an employee based on fabricated charges of misconduct might ordinarily give rise to an inference of discrimination because it suggests bad faith on the part of the employer, *see, e.g.*, *Plummer*, 559 F. Supp. at 329 (holding that a plaintiff may satisfy the *McDonnell Douglas* by, *inter alia*, "prov[ing] that . . . he did not [*25] engage in the conduct for which he was disciplined"), [7] such an inference is not warranted here because the FAMS was not responsible for the issuance of a citation to the plaintiff and "should not be held liable under Title VII for the alleged racially discriminatory acts of third parties with whom [the FAMS] has no affiliation and over whom [the FAMS] had no control or influence." *Williams v. Astra USA, Inc.*, 68 F. Supp. 2d 29, 35 (D. Mass. 1999); *see also Rosenbloom v. Senior Resource, Inc.*, 974 F. Supp. 738, 743 (D. Minn. 1997) (finding no "case law where an employer has been held liable for the racial harassment of an employee by a third party"). Instead, the only way that Kistler's decision to terminate the plaintiff's employment could give rise to an inference of discrimination would be if (1) the plaintiff did not engage in the conduct for which he was cited *and* (2) Kistler (or some other member of the Training Committee responsible for the plaintiff's termination) knew that the defendant had not engaged in the conduct for which he was cited.

---

**FOOTNOTES**

[7] In *Plummer*, a postal worker in the District of Columbia sued William Bolger, then the Postmaster General for the United States Postal [*26] Service, in his official capacity for alleged race, ethnic, and sex discrimination under Title VII. *See Plummer*, 559 F. Supp. at 328-29 (recounting the factual and procedural background of the plaintiff's suit). After a bench trial before a former member of this Court, the Court entered findings of fact and conclusions of law in which it held that the plaintiff, a Caucasian male, had failed to satisfy the additional burden imposed on "reverse discrimination" claims that the plaintiff demonstrate "'background circumstances support[ing] the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Id.* at 329 (quoting *Parker v. Baltimore & Ohio R.R. Co.*, 209 U.S. App. D.C. 215, 652 F.2d 1012, 1017 (D.C. Cir. 1981)). The Court then concluded that even if the plaintiff had satisfied the additional requirements of a "reverse discrimination" claim, he still would not have met the prima facie requirement set forth in *McDonnell Douglas* because, even though the plaintiff "alleged that he did not engage in the conduct for which he was disciplined[,] . . . the Court . . . found that [the] plaintiff did do the things for which he was disciplined." *Id.*

*Plummer* relied upon *Green v. Armstrong Rubber Co.*, 612 F.2d 967 (5th Cir. 1980), [*27] and *Sullivan v. Boorstin*, 484 F. Supp. 836 (D.D.C. 1980), in articulating the standards for the plaintiff to satisfy *McDonnell Douglas*'s prima facie requirement. Since that time, the District of Columbia Circuit has articulated the three-part standard employed by the Court in the instant memorandum opinion. *See supra* Part III. Nevertheless, the general principle set forth in *Plummer* strikes the Court as fundamentally sound in most instances insofar as that principle is applied within the context of the three-part standard enunciated by the District of Columbia Circuit. However, to the extent that *Plummer* could be read to suggest that a plaintiff could establish a prima facie case of racial discrimination solely by showing that he did not engage in the conduct for which he was disciplined, *i.e.*, without having to satisfy the first and second prongs of *George*'s tripartite test, *George*, 407 F.3d at 412, the case must be rejected as contrary to the controlling precedent in this Circuit.

---

Nothing in the record establishes that Kistler, [8] Davis, [9] or any other member of the Training Committee had any desire or opportunity to abet the alleged racial prejudice of the officer

who issued the plaintiff **[*28]** the citation. [10] The only piece of evidence that comes remotely close to implying such an understanding is one part of Hill's deposition testimony in which he opines that the officer who issued a citation to the plaintiff "had to" have known "the people there at that training facility for the FAM and for the FLETC" because "he was at the graduation chumming it up with them when [Hill] graduated." Hill Dep. 96-97 (March 20, 2007) (cited in Pl.'s Reply at 12-13). [11] This kind of "[i]nnuendo and suspicion," based on nothing more than the fact that "some" unidentified "people" were "chumming it up" with the officer who issued a citation to the plaintiff, "do[es] not substitute for evidence that the decision to remove [the plaintiff] from FLETC training was motivated by considerations of race." *Turner v. Fed. Law Enforcement Training Ctr.*, Civil Action No. 04-0606 (HHK), 2007 U.S. Dist. LEXIS 91558, 2007 WL 4355170, at *8 (D.D.C. Dec. 14, 2007).

## FOOTNOTES

[8] The plaintiff points to Kistler's statement that "[t]he officer [who issued the plaintiff a citation] and [the plaintiff's] FLETC colleagues, who were present at the time, reported that [the plaintiff was] uncooperative and had to be subdued by [the plaintiff's] colleagues," **[*29]** Kistler Letter at 1, as evidence of pretext because "the declarations of the trainees . . . never stated that [the p]laintiff had to be subdued, nor do their statements imply an occurrence of such conduct." Pl.'s Opp'n at 17. But this apparent error at most suggests that Kistler slightly overstated the amount of evidence supporting his conclusion that the plaintiff should be terminated, not that the conclusion itself was a fabrication. It certainly does not give rise to an inference that Kistler knew of and overlooked the alleged racial discrimination of the police officer in citing the plaintiff for violation of New Mexico's open container law and for disorderly conduct.

[9] The plaintiff suggests that Davis falsely "testified that he personally met and interviewed each of the trainees," Pl.'s Opp'n at 17, and that this testimony "was vehemently disputed by . . . Hill in his deposition," *id.* Hill actually testified that he could not remember meeting with Davis in the past, not that he had never done so. *See* Hill Dep. 56 (March 20, 2007) ("Q. . . . And again[,] . . . you can't recall who Mr. Timothy Davis was during that time period or if you ever met with Mr. Timothy Davis, correct[?] **[*30]** A. No.").

[10] To the contrary, Davis testified at his deposition that he took into consideration the plaintiff's allegations of racial discrimination by the police officer who issued the plaintiff the citation in making his recommendation to Kistler, Davis Dep. 101:15-17 (Feb. 23, 2007), but nevertheless recommended that he be dismissed from the FAMS training program based on his "personal interviews" with all of the FAM trainees involved in the incident and the police report, *id.* at 65:10-12, 17-19.

[11] Other supposed examples of racial prejudice culled from Hill's deposition transcript are even more delusory. For example, the plaintiff points to a passage in the deposition where Hill states that before he wrote his statement to the Training Committee his mentor told him that he should "be careful what [he] wr[o]te" because "they[] [were] looking at [Hill]" and "watching [him]," Hill Dep. 75 (March 20, 2007) (quoted in Pl.'s Reply at 13). This cryptic comment from Hill's mentor is so devoid of any context that it cannot permit any reasonable inference with respect to those FAMS personnel in a position to affect Hill's employment, much less an inference that those personnel were prejudiced **[*31]** against Hill (or, by implication, the plaintiff) on the basis of race.

The plaintiff also points to a conversation between Hill and a "Mr. Gant" at lunchtime, *id.* at 72, during the course of which Mr. Gant stated that "they said they had to get rid of that black guy." *Id.* at 75 (quoted in Pl.'s Reply at 13). Like the purported warning from Hill's mentor, this quote is too vague to permit any sort of inference with respect to why

the plaintiff was terminated. It is simply impossible to discern from this double hearsay statement (1) whether it was Gant or someone in the Training Committee who referred to the plaintiff as "that black guy," (2) whether Gant intended to convey his belief that someone on the Training Committee felt that the FAMS had to terminate "that black guy" *because* he was African-American, or instead meant to convey that someone on the Training Committee had used the phrase "black guy" as a way of describing someone who had been terminated from the FAMS, or (3) whether the unknown member of the Training Committee who may or may not have described the plaintiff as a "black guy" actually believed that the FAMS intended to terminate the plaintiff because of his race or **[*32]** was simply using race and gender as a shorthand for describing someone who had been terminated for some legitimate reason. The Court recognizes that it is obligated to draw all inferences in the plaintiff's favor in considering the defendant's motion for summary judgment, but (setting aside for the moment the inadmissibility of the statement on hearsay grounds) a reasonable factfinder would have to engage in nothing less than rank speculation to conclude that anyone on the Training Committee was biased against the plaintiff because some unidentified group of individuals was "watching" Hill and another FAMS employee described the plaintiff as a "black guy" in the lunchroom.

In any event, it is plain from the record before the Court that the plaintiff did in fact commit the offenses for which he was cited. According to the Supplemental Report, only two open containers of alcoholic beverages were found in the trainees' car: "a 12[-]ounce bottle of Michelob light beer about three quarters full, which was still cold to the touch, on the passenger side of the floorboard, centered in the middle," and "another 12[-]ounce bottle of Michelob light" that "was empty and warm." Supplemental Report **[*33]** at 1. [12] Significantly, the plaintiff freely admits that the half-filled bottle belonged to him. *See* Holloman Dep. 72:9 (Jan. 9, 2007) ("And [the officer] said, [']Whose beer was this? Whose liquor was this?['] And then he said, [']Is this your beer in the front seat?['] I said, [']Yeah. It's mine.[']"); *id.* at 78:4 ("I'm not going to lie about drinking a beer in the parking lot. I just had a beer earlier tonight. It was mine."); *id.* at 78:5 ("[The beer] was mine from earlier that night.").

**FOOTNOTES**

[12] All of the witnesses to the plaintiff's citation corroborate this account. According to Hickey, the police officer who issued the plaintiff a citation "found a half-full beer in the passenger seat floor where [the plaintiff] was sitting . . . and found an empty beer bottle in the back right seat floor," which, in the officer's estimation, "was dry and must have been from earlier." Hickey Statement at 1. Felde stated in his internal memorandum to the Training Committee that "[w]hen the officer searched the car he found an open beer sitting on the front passenger side floor where [the plaintiff] had been sitting" and "an empty beer bottle on the rear passenger floor where [Hickey] had been sitting," **[*34]** and that the officer "searched the rest of the car and a cooler that was in the car without any further incident." Felde Memo at 1-2. Finally, Albert Hill stated that when the officer began his search of the car "there was one empty bottle [of beer] on the rear floorboard[] and one bottle [of beer] on the front floorboard [of unknown quantity]." Hill Statement at 2.

The plaintiff's mere possession of an open container of beer while he was in the car violated New Mexico's open container law. *See* [HN9] N.M. Stat. § 66-8-138(B) (prohibiting the "knowing[] . . . possession . . . , while in a motor vehicle upon any public highway within this state, any bottle . . . containing any alcoholic beverage that has been opened"). And the plaintiff's "irate and verbally abusive" behavior towards the officer who issued him the citation, Supplemental Report at 1, plainly constituted "violent, abusive, indecent, profane,

boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace." N.M. Stat. § 30-20-1(A). Thus, the plaintiff cannot credibly argue that he did not commit the offenses for which he was cited and (with respect to his behavior towards the police officer who issued **[\*35]** him a citation) his employment terminated.

The plaintiff also contends that "his actions of denying [that] he was drinking in the parking lot and initially declining consent to search his vehicle do[] not rise to the level of misconduct that warranted termination," Pl.'s Opp'n at 9, and that "a jury should be able to decide . . . whether a delayed consent to search a vehicle is a basis for [the] disciplinary actions [taken against the p]laintiff," id. at 12. But *HN10* "Title VII . . . does not authorize a federal court to become a superpersonnel department that reexamines an entity's business decisions," Barbour v. Browner, 337 U.S. App. D.C. 50, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (internal quotation and citation omitted), and the Court "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive." Fischbach v. District of Columbia Dep't of Corrections, 318 U.S. App. D.C. 186, 86 F.3d 1180, 1183 (D.C. Cir. 1996). The unrebutted evidence in the record suggests that Kistler's only motive in terminating the plaintiff was to "promote the efficiency of the [FAMS]," Kistler Letter at 2, and this Court has neither the authority nor the inclination to pass judgment on the wisdom of any managerial decisions **[\*36]** made by Kistler in service to that motive.

In short, there is no evidence in the record giving rise to an inference of discrimination on the part of the FAMS. Absent such evidence, the plaintiff cannot satisfy the prima facie requirement of McDonnell Douglas. The Court must therefore grant summary judgment in the defendant's favor.

## III. Conclusion

*HN11* "The central focus of the inquiry in a case such as this is always whether the *employer* is treating some people less favorably than others because of their race, color, religion, sex, or national origin." Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978) (internal quotation and citation omitted) (emphasis added). Plainly, the plaintiff feels aggrieved, perhaps justifiably so, [13] by the treatment he received by the police officer who issued him the citation on the morning of July 27, 2002. Whatever one might think about the police officer's conduct that night, there is no basis in the record for concluding that the plaintiff's employer had reason to believe that the officer's actions were legally unjustified, but nevertheless terminated the plaintiff's employment because of his race. And without such evidence, the officer's conduct cannot **[\*37]** be imputed to the defendant and, accordingly, the plaintiff cannot even muster a prima facie case for discrimination by the defendant on the basis of the plaintiff's race. Thus, the undisputed evidence in the record leaves the Court with no choice but to grant summary judgment in the defendant's favor.

---

**FOOTNOTES**

[13] Without question, there is at least a genuine dispute of material fact as to whether the police officer who issued the plaintiff a citation behaved in a racially discriminatory manner. See, e.g., Hill Dep. 45 (March 20, 2007) ("Q. As a black man and as a black law enforcement officer[,] did you perceive that you and Mr. Holloman were being treated that night--is it your opinion that you all were treated differently that night based on race or color? A. Yes."). But the police officer who issued the plaintiff a citation is not the defendant in this law suit. It is the conduct of the plaintiff's former employer that is at issue in this case, and nothing in the record suggests that any employee of the FAMS was in any way complicit in the police officer's alleged wrongdoing.

**SO ORDERED** this 11th day of February, 2008. [14]

---

**FOOTNOTES**

[14] An order granting the defendant's motion for summary judgment, denying  **[\*38]** the defendant's cross-motion for summary judgment, granting summary judgment in favor of the defendant on the plaintiff's wrongful termination claim, and closing this case follows.

---

REGGIE B. WALTON

United States District Judge

Source:  Legal > / . . . / > **District of Columbia Circuit - US District Court Cases** ℹ️
Terms:  **name(holloman and chertoff)**  (Edit Search | Suggest Terms for My Search)
View:  Full
Date/Time:  Friday, March 28, 2008 - 5:49 PM EDT

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Transactional Advisor | Counsel Selector
History | Delivery Manager | Switch Client | Preferences | Sign Off | Help

 LexisNexis®

About LexisNexis  | Terms & Conditions  | Contact Us
Copyright ©  2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.